**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Neal LEWIS, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ira Lee DICKERSON, Defendant–
Appellant.**

Nos. 92–5670, 92–5771.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 29, 1993.

Decided Dec. 8, 1993.

John Dewey Elliott, Columbia, SC, argued, for appellant Lewis.

Creighton B. Coleman, Columbia, SC, argued, for defendant-appellant Dickerson.

Mark C. Moore, Asst. U.S. Atty., Columbia, SC, argued (Margaret B. Seymour, U.S. Atty., on brief), for plaintiff-appellee.

Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.

## OPINION

WILLIAMS, Circuit Judge:

James Neal Lewis was convicted by a jury of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1988), and two counts of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988). Ira Lee Dickerson was convicted by a jury of two counts of conspiracy to possess with the intent to distribute cocaine, also in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988).

Lewis and Dickerson appeal. Both contend that the Government improperly bolstered the testimony of its witnesses. In addition, Lewis contends that he was denied his right to trial by a jury selected from a fair cross-section of the community and he challenges the admission of hearsay testimony. Dickerson claims that the district court denied him his right of allocution and erred in failing to make a downward departure from the United States Sentencing Guidelines. Finding no error, we affirm.

## I. FACTS

James Neal Lewis (a/k/a "48") and Ira Lee Dickerson ("Heavy D") were initially indicted with sixteen others in January 1991. The charges involved a conspiracy which was centered in Fort Lauderdale, Florida, and Kingstree, South Carolina. Most of the conspirators were arrested in January 1991. The Defendants at that time were known only by their street names and could not be found by authorities.

Lewis was eventually arrested in late 1991, Dickerson in early 1992, and they were tried together in May 1992. Claiming that the venire did not present a fair cross-section of the community, Lewis filed an objection to the jury panel and moved for an alteration or enlargement of the venire. This motion was denied, and the trial proceeded.

The Government's case against Lewis and Dickerson was primarily based on the testimony of cooperating witnesses who had reached plea or immunity agreements with the Government. Defense counsel attacked the credibility of these witnesses, claiming that they had motive to lie because they wished to "get out of a jam." (J.Supp.A. 13–14.) The Government called Special Agent Teresa Woods to rehabilitate these witnesses and to detail the Government's investigative techniques.

Following a two-day trial, Appellants were convicted. After determining Dickerson's total offense level under the United States Sentencing Guidelines, the district court asked if there were any motions for departure; both the defense and the prosecution said no. The court expressed its intention to sentence Dickerson at the bottom of the Guidelines and then inquired, "Anything from the defendant?" Dickerson's counsel addressed the court, but Dickerson did not speak. Dickerson was sentenced to the statutory minimum—262 months on each of the two counts, to be served concurrently. Lewis was sentenced to 360 months for each of the three counts against him, also to be served concurrently. Both appeal their convictions, and Dickerson appeals his sentence.

## II. IMPROPER BOLSTERING

Appellants claim that the Government in this case improperly bolstered the testimony of its own witnesses. During trial, Appellants attacked the credibility of various witnesses by presenting prior inconsistent statements made by those witnesses to law enforcement officers. The Government sought to rehabilitate by having the case officer, Special Agent Teresa Woods, testify about the process of interrogating witnesses and the investigation of the case. Appellants contend that Woods's testimony amounted to a "law enforcement expert vouching for the integrity of the investigative process," and that admission of her testimony is reversible error. (J.A. 17.) We review the admission of this testimony under an abuse of discretion standard. *See United States v. Clark*, 986 F.2d 65, 68 (4th Cir.1993).

■■ It is error for the Government to bolster or to vouch for its own witnesses. *United States v. Samad,* 754 F.2d 1091, 1100 (4th Cir.1984); *United States v. Piva,* 870 F.2d 753, 760 (1st Cir.1989). Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness. *United States v. Kerr,* 981 F.2d 1050, 1053 (9th Cir.1992). Consequently, the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony. *United States v. Sims,* 719 F.2d 375, 377 (11th Cir. 1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). Here, Appellants admit that the prosecutor neither gave explicit personal assurances that his witnesses were trustworthy, nor indicated that information not presented to the jury supported his witnesses' testimony.

■ While improper vouching must generally come from the prosecutor's own mouth, a prosecutor's solicitation of assertions of trustworthiness from government witnesses may also be impermissible vouching. *Piva,* 870 F.2d at 760. That did not take place in this case. Case officer Woods did not testify as to anyone's trustworthiness. Rather, she testified about the investigative techniques employed by the Government. The following is typical of the testimony to which the Appellants objected at trial:

Q: How did you make this case? . . .

A: With this particular case, we never got drug buys, never had drugs on the table, that's what we always say. We had to use ex-dealers or drug users that has had [sic] experience with the Williams organization, and by the way I mean by that [sic], is that they have purchased drugs from them, they have sold drugs for them, or even if they were on the streets in which the drugs were being dealt. (J.A. 208.)

This testimony is not objectionable. As the district court pointed out in denying Appellants' objections to the testimony, the Government has a right to explain its proce-dures and the relationship between the Government and its witnesses. *See United States v. Evans,* 917 F.2d 800, 809 (4th Cir. 1990) (undercover agent's testimony as to observation of his actions by supervisors not impermissible vouching); *United States v. Henderson,* 717 F.2d 135, 138 (4th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984) (plea agreement is admissible to show the extent of a witness' relationship with the government and does not constitute bolstering).

Agent Woods merely explained the Government's procedures for locating and interviewing witnesses and thereby put evidence in front of the jury from which the jury could evaluate for themselves whether the witnesses were trustworthy. This is not vouching or bolstering, and the district court did not abuse its discretion in admitting this testimony.

### III. *FAIR CROSS-SECTION CHALLENGE*

■ Appellant Lewis also claims that he was denied his right to trial by a jury selected from a fair cross-section of the community. In *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the Court outlined the test for such challenges:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Lewis contends that African–American residents have been disproportionately excluded from the venire in South Carolina. We find that while the group is concededly distinctive, Lewis has completely failed to establish the other two prongs of the *Duren* test.

Our analysis begins with a look at the process by which the jury venire is compiled.

Pursuant to the Jury Selection Plan adopted by the District of South Carolina, jury veniles in South Carolina are drawn from voter registration lists. The Plan specifically provides that potential jurors are to be selected at random from a cross-section of the community and that no citizen shall be excluded "on account of race, color, religion, sex, national origin or economic status." [1] The plan was carefully considered and approved by this court.[2] Furthermore, Congress has proclaimed that voter registration lists are the preferred source of names for prospective jurors. *See* The Jury Selection Act, 28 U.S.C. § 1863(b)(2) (1988).

In *United States v. Cecil,* 836 F.2d 1431 (4th Cir.), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988), we held that use of current voter registration lists as the source for a jury pool from which random selection of jurors is made presumptively provides a fair cross-section, even if minorities are underrepresented on those lists, as long as there is no affirmative discrimination in registration. *Id.* at 1448 ("[T]here is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open.").

In reaching that conclusion, we said that in order to be fair and reasonable, the disparity " 'between the proportion of eligible whites selected for master jury wheel and proportion of eligible minority persons selected' " must not exceed twenty percent. *Id.* at 1453 (*quoting Foster v. Sparks,* 506 F.2d 805, 818 (5th Cir.1975)). Both parties to this appeal agree that the disparity between the proportion of eligible whites selected for the venire and the proportion of eligible African–Americans in this case is below twenty percent. Lewis does not cite any specific instances of discrimination or any evidence of affirmative discrimination in registration. Thus, under *Duren* and *Cecil,* Lewis has failed to present a prima facie case.

Lewis urges us to find the jury selection process used in this case unconstitutional nonetheless. He claims that a predominantly white voting age population in the division at issue [3] and a general history of societal discrimination argue for an exception to the general rule that voter lists provide a fair cross-section of the community for purposes of jury selection.

Lewis argues that in the division of the state in which the trial took place, whites eligible to vote outnumber eligible African–Americans by two to one and therefore the prospect of whites being selected for jury duty becomes even greater, and correspondingly, the likelihood of African–Americans being chosen for a particular jury is diminished. Thus, Lewis would create an exception to the presumptive validity of voter lists as a source for the jury venire when the population eligible to vote in the district in question is predominantly white. Lewis also argues that a history of discrimination in South Carolina amounts to systematic exclusion of African–Americans from voting lists. We decline to carve an exception to the general test outlined in *Cecil* for districts that are racially disproportionate or which carry the same history of discrimination found throughout the South. Lewis offers neither evidence of current discrimination nor evidence of impediment to any group to register to vote. The unsupported exception urged by Lewis would be potentially without limits and would throw into question the integrity of a jury selection process that is universally accepted.

---

**1.** *Amended Plan of the United States District Court for the District of South Carolina for the Random Selection of Grand and Petit Jurors,* District of South Carolina, 2 (Order of Chief Judge Sol Blatt, Jr., United States District Court for the District of South Carolina, Oct. 12, 1989) (J.Supp.A. 2–9). The jury administrator for the district court, Janet Woodward, testified at trial that the jury venire in this case was selected in accordance with the district's jury selection plan.

**2.** *In Matter of the Review of the Amendment to the Jury Selection Plan Submitted by the United States District Court for the District of South Carolina* (Order of Chief Judge Ervin of the Fourth Circuit Court of Appeals, Nov. 28, 1989) (J.Supp.A. 1).

**3.** South Carolina is divided into three divisions for jury selection purposes; the jury in this case was chosen from the "B" division or box, which includes the Columbia, Florence, and Rock Hill areas of the state.

## IV. ADMISSION OF COCONSPIRATORS' STATEMENTS

■ Lewis also challenges the admission of testimony from government witness Frank Black, offered under Fed.R.Evid. 801(d)(2)(E). Black was a coconspirator who entered into a plea bargain with the Government. In the following colloquy during Frank Black's testimony, "48" is Appellant James Lewis, and coconspirator Bennie Lewis is also referred to by his street name, "Fireball":

Q: What did 48 [Lewis] say to you?

A: Well, we were talking and he wanted to find Bennie Harris.

Q: Did he tell you why he wanted to find Bennie Harris?

A: No sir. The only thing he said was he had some work for Fireball [Harris] to do.

.    .    .    .    .

Q: All right. And did you tell him where to find Bennie Harris and—

A: Yes, sir.

Q: Did you talk to Bennie Harris about his conversation with 48?

A: Yes.

Q: What did he tell you?

A: Well, Fireball, Bennie Harris told me that 48 had something for him to do.

.    .    .    .    .

Q: What specifically did Bennie Harris tell you about his conversation with 48, specifically?

A: Bennie Harris told me that 48 wanted him to sell drugs for him in Lake City.

Q: And did Bennie Harris tell you if he agreed to do that?

A: Yes, he did. (J.A. 179–180.)

As out-of-court statements offered for the truth of the matter asserted, these remarks by Bennie Harris as recounted by Black would ordinarily be hearsay. The Government offered this testimony under the coconspirator exception to the hearsay rule, Fed. R.Evid. 801(d)(2)(E):

A statement is not hearsay if … [t]he statement is offered against a party and is … a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

It is undisputed that the statements in question were offered against a party (Lewis) and were the out-of-court statements of a coconspirator (Harris) offered to prove that Lewis solicited Harris to sell drugs. Lewis relies on our decision in *United States v. Urbanik*, 801 F.2d 692 (4th Cir.1986), to argue that the statements are inadmissible hearsay because they are not statements made "during the course and in furtherance of the conspiracy." In *Urbanik*, the contested testimony was described as follows:

Haselhuhn [a drug dealer] testified that until March 1981 he purchased cocaine and marijuana from Pelino on numerous occasions…. Haselhuhn was permitted to testify about statements made to him by Pelino in the summer of 1980. At the time of the statements, Haselhuhn was at Pelino's house to pay for some drugs and obtain a new supply. He testified that after concluding their business, he and Pelino were engaging in casual conversation about weight-lifting … In the course of discussing their own abilities, Pelino told Haselhuhn about a "friend in the Keys" named Axel [Urbanik] from whom he obtained marijuana" at 1,000 pounds a clip" who was "a little short guy" but could bench press 300 pounds.

*Id.* at 695. We held in *Urbanik* that "this statement can fairly be treated only as the sort of idle conversation which though it touches upon, does not 'further,' a conspiracy," and that admission of the testimony was error. *Id.* at 698.

We disagree with Lewis's assertion that *Urbanik* renders Black's testimony inadmissible. The statement in this case was part of a conversation among coconspirators about ongoing activities in the conspiracy itself and were made in furtherance of that conspiracy. In the challenged statements, Lewis sought Black's help in contacting Harris, who in turn explained to Black that Lewis recruited him into the conspiracy. These conversations were integral to arranging drug sales, the central work of the conspiracy; all three men

were members of that conspiracy. This was not the idle chatter that we found in *Urbanik*, and the district court did not abuse its discretion in admitting this evidence.

## V.· *ALLOCUTION*

Appellant Dickerson claims for the first time on appeal that the district court erred by not giving him an affirmative opportunity to speak to the court at sentencing. After expressing its intention to sentence Dickerson to the minimum sentence allowed by the Guidelines, the court said: "Anything from the Defendant?" Defendant's counsel replied, "He wanted me to tell the court . . . he is a good person. His mother is a school teacher." (J.A. 281–82.) The court shortly thereafter asked, "Anything further from either party?" Defendant's counsel replied, "That's all, your Honor." (J.A. 282.)

The sentencing court must "address the defendant personally and determine if the defendant wishes to make a statement and to present any information in the mitigation of the sentence." Fed.R.Crim.Proc. 32(a). Merely affording the Defendant's counsel the opportunity to speak does not fulfill·the requirements of Rule 32(a). *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961).

Because no objection was made to the sentencing court, we review this allegation of a denial of allocution under a plain error analysis. *United States v. Olano*, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). *Olano* makes clear that plain error analysis should apply when the right in question has been forfeited; that is, when the party makes no timely assertion of the right. *Id.* at ——, 113 S.Ct. at 1777.

Plain error under Fed.R.Crim.Proc. 52(b) requires reversal when: (1) there has been an error, (2) the error is plain, and (3) the plain error affected substantial rights, which in most cases means that "the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." *Id.* at ——, 113 S.Ct. at 1777–78. Here, there was a violation of Rule 32(a)(1)(C). The Supreme Court has said, "trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." *Green*, 365 U.S. at 304–05, 81 S.Ct. at 655. There is some room for doubt in this case as to whether "[a]nything from the Defendant?" was addressed to Dickerson. The Government concedes that the lower court failed to address Dickerson personally. Thus, there was error, and it was plain.

It is the third requirement for reversal that is not met here. Dickerson has failed to show that the error was either prejudicial or that it affected his substantial rights. *See id.* —— U.S. at ——, 113 S.Ct. at 1778 (defendant bears the burden of persuasion with respect to prejudice). There were no motions by either Dickerson or the Government to depart from the Guidelines range, and Dickerson was sentenced to two concurrent terms of 262 months, the minimum time required under the Guidelines for his offense level and criminal history category. Nothing Dickerson might have said in allocution could have reduced his sentence, for he received the shortest sentence allowed by statute. To vacate and remand to reimpose the same sentence would be a fruitless exercise. We, therefore, affirm.

## VI. *REFUSAL OF A DOWNWARD DEPARTURE*

Appellant Dickerson also contends that the district court erred in failing to make a downward departure from the United States Sentencing Guidelines range. The court is required to sentence within the range set by the Guidelines unless the court finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . . that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b) (West Supp. 1993).

A sentencing court's refusal to deviate downward from the Guideline sentence is not reviewable unless the refusal stems from the court's mistaken belief that it lacks authority to so deviate. *United States v. Bayerle*, 898 F.2d 28, 31 (4th Cir.), *cert. denied*, 498 U.S. 819, 111 S.Ct. 65, 112

L.Ed.2d 39 (1990). While Dickerson claims the district court did not know it had the authority to deviate from the Guidelines, we disagree.

The district court asked the Government and the defense at sentencing whether either wished to submit a motion for upward or downward departure, and no such motion was offered. When announcing the sentence, the court said: "That's more time than a man should receive, but that is what the Guidelines say and I don't know what I can do about them." It is obvious that the judge knew he had the ability to depart downward; otherwise, he would not have asked for motions to that effect. His comment demonstrates only that he realized he did not have the authority to depart from the Guidelines when neither party presented any mitigating or aggravating circumstances. *See* 18 U.S.C.A. § 3553(b) (West Supp.1993).

### VII.

In sum, we find no merit in Appellants' claims of error. We affirm the convictions of Lewis and Dickerson, and affirm Dickerson's sentence.

*AFFIRMED.*