37 F.3d 1497
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel A. VOGEL, Jr., Defendant-Appellant.
 No. 93-5275.
 United States Court of Appeals, Fourth Circuit.
 Argued July 14, 1994.
Decided Oct. 12, 1994.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (CR-91-440-2)
 ARGUED: Roger William Smith, Tharrington, Smith & Margrove, Raleigh, NC, for appellant.
 David S. Kris, U.S. Dept. of Justice, Washington, DC, for appellee.
 ON BRIEF: E. Hardy Lewis, Tharrington, Smith & Hargrove, Raleigh, NC, for appellant.
 J. Preston Strom, Jr., U.S. Atty., Alfred W. Bethea, Asst. U.S. Atty., U.S. Dept. of Justice, Washington, DC, for appellee.
 D.S.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 On October 3, 1991, a federal grand jury sitting in the District of South Carolina returned a twelve-count indictment charging Daniel A. Vogel and several others with conspiracy and several substantive offenses stemming from a scheme to burn down Vogel's beach house and collect the fire insurance proceeds. Vogel was convicted by a jury on all but two of the counts in the indictment. The district court sentenced him to 120 months' imprisonment, three years of supervised release, and $1,659,144.60 in restitution to his insurance company. Vogel has appealed his conviction and his sentence on the following grounds:
 
 
 2
 1) that the government improperly vouched for the credibility and truthfulness of its primary witness, Charles Terry Norman;
 
 
 3
 2) that the introduction of Vogel's co-defendants' convictions invited the jury to find Vogel guilty by association;
 
 
 4
 3) that the district court committed plain error by admitting "expert" testimony concerning Vogel's bankruptcy proceedings;
 
 
 5
 4) that the evidence did not establish a sufficient nexus with interstate commerce to satisfy the jurisdictional requirement of the federal arson statute, 18 U.S.C.Sec. 844(i);
 
 
 6
 5) that the language of the verdict form submitted to the jury required Vogel to prove his innocence beyond a reasonable doubt;
 
 
 7
 6) that Vogel's convictions on Counts 9 and 11 merged with his convictions on Counts 10 and 12;
 
 
 8
 7) that Vogel was improperly sentenced under the Sentencing Guidelines; and
 
 
 9
 8) that the district court erred in imposing restitution on Vogel.
 
 
 10
 Finding Vogel's several grounds for appeal unpersuasive, we affirm the district court's decision.
 
 BACKGROUND
 
 11
 Daniel Vogel, a business man from Charlotte, North Carolina, hired Larry Moore, Philip McLamb and Charles Terry Norman to burn down his own beachfront house located at 6202 North Ocean Boulevard in Myrtle Beach, South Carolina.[1] During his trial, the government offered the theory that Vogel wanted his house destroyed because he had filed for bankruptcy under Chapter 11 and needed the insurance proceeds to pay his creditors. Vogel's Chapter 11 reorganization plan, developed in bankruptcy proceedings during 1987, required him to make large payments to creditors which Vogel allegedly could not have afforded without the insurance proceeds.
 
 
 12
 In the summer of 1987, Vogel contacted Moore, a former tenant, and asked him to arrange the arson of Vogel's beach house. In business with McLamb and Norman, Moore recruited the two men to help him commit the arson in exchange for $100,000, ten percent of the anticipated proceeds. On August 15, 1987 Vogel met with Moore and Norman for about 45 minutes to discuss the arson and to take the two men on a tour of his beach house in South Carolina. Norman testified that he and Moore told Vogel they would burn the house to the ground using gasoline and C4 explosives. Norman also testified that Vogel said he wanted to make sure no one got hurt and that Moore assured him they knew what they were doing.
 
 
 13
 In the Fall, Vogel contacted Moore and told him to go ahead with the arson. It took three different attempts on three consecutive days for the defendants to accomplish their goal, November 20, 21, and 22, 1987. The first attempt involved Moore, McLamb, and Norman. Alison Harbour was also present in South Carolina when they attempted the arson. Although Moore arranged the initial attempt, he did not accompany Norman and McLamb to the house. Notified upon his return to North Carolina that the attempt had not been successful, Norman said he would return to try again but that he did not want to go back with McLamb. That night, Norman, Blake Tilley, and Gregory (nicknamed Murdock) went back to South Carolina, and Tilley and Gregory attempted the arson. After the three returned home, Norman was notified once again that the attempt had not been successful. At that point, Gregory said he would take care of it himself. He returned to South Carolina and effectively destroyed the beach house on November 23, 1987.
 
 
 14
 After the house was destroyed, Vogel submitted claims to Aetna Casualty & Surety Co., which the insurance company proceeded to pay in installments. Aetna paid him over $1.6 million under the terms of his policy.
 
 
 15
 On October 3, 1991, a federal grand jury returned a twelve count indictment against Vogel and others charging them with conspiracy and several substantive offenses stemming from the scheme to burn down Vogel's house and collect the insurance proceeds. Vogel was convicted of conspiracy (Count 1) in violation of 18 U.S.C. Sec. 371; five counts of mail fraud and aiding and abetting that crime (Counts 2-6) in violation of 18 U.S.C. Secs. 1341 and 2; two counts of arson and aiding and abetting that crime (Counts 9 and 11) in violation of 18 U.S.C. Sec. 844(i) and 2; and two counts of using fire to commit a felony and aiding and abetting that crime (Counts 10 and 12) in violation of 18 U.S.C. Sec. 844(h)(1) and 2. He was acquitted on one count of arson (Count 7) and one count of using fire to commit a felony (Count 8).
 
 
 16
 The district court used the 1987 edition of the Sentencing Guidelines to calculate Vogel's sentence. Under Sec. 3D1.2(b), the Presentence Report (PSR) grouped the conspiracy and mail fraud counts (Counts 1-6) together with the two fire and explosives counts stemming from the arson attempt on November 21, 1987 (Counts 9-10). The base offense level for that group of counts was 6 under Sec. 2K1.4, which was then increased by 18 levels pursuant to Sec. 2K1.4(b)(1) because Vogel was found to have knowingly created a substantial risk of death or serious bodily injury. The court increased Vogel's sentence by another 4 levels under Sec. 3B1.1 because the court found Vogel to be an organizer or leader of the criminal activity. His adjusted offense level for that group of offenses was 28.
 
 
 17
 The PSR treated the fire and explosives charges stemming from the successful arson on November 22, 1987 (Counts 11 and 12) as a separate group of offenses. Using the same calculations, the report suggested an adjusted offense level of 28. Because Vogel had two groups of offenses with an adjusted level of 28, his total offense level was increased by 2 levels under Sec. 3D1.3 and Sec. 3D1.4, bringing his total offense level to 30. Under the applicable criminal history category of I, the sentencing range was 97-121 months. The court accepted the presentencing report with only a few minor changes in the representations of the facts, entertained and overruled Vogel's objections to that report during the sentencing hearing, and sentenced Vogel to 120 months' imprisonment to be followed by three years' supervised release.
 
 
 18
 The PSR contained a detailed description of Vogel's financial condition. The report also indicated that he owed Aetna Casualty $1,659,144.60, and the court ordered him to pay restitution in that amount in installments of $553,048.00 over three years.
 
 
 19
 Vogel's appeal is based on alleged errors in both the trial and the sentencing process.
 
 Standard of Review
 
 20
 We review a district court's evidentiary rulings for an abuse of discretion. United States v. Hassan El, 5 F.3d 726, 731 (4th Cir.1993). When an appellant has failed to object during the proceedings below, we review for plain error. Federal Rule of Civil Procedure 52(b); United States v. Jarvis, 7 F.3d 404, 410 (4th Cir.1993), cert. denied, 114 S.Ct. 1200 (1994). Pursuant to 18 U.S.C. Sec. 3742(e), we grant due deference to the district court's determinations under the Sentencing Guidelines. If the issue involves a factual determination, we apply the clearly erroneous standard of review. See, Anderson v. Bessemer City, 470 U.S. 564, 573-76 (1985); United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir.1989).
 
 Improper Vouching
 
 21
 Charles Terry Norman and three of Vogel's convicted codefendants testified at Vogel's trial pursuant to plea agreements. As a result of Norman's cooperation with the government and a plea agreement pertaining to a prior unrelated offense, Norman was not indicted for the arson of Vogel's home. Norman provided the government with details about the arson and testified against Vogel's codefendants. Prior to the trial, the prosecutor asked the court if he could discuss Norman's plea agreement and the co-defendant's convictions during the presentation of his case-in-chief. Knowing that Vogel would undoubtedly raise those issues on cross, the prosecutor explained that he intended to address them on direct. Vogel informed the court that he did not object to that procedure.
 
 
 22
 On direct, the prosecutor asked Norman, the government's first witness, about the terms of his plea agreement. Norman testified that if he cooperated fully and testified truthfully the government would move the court for a downward departure from his Guidelines sentence for a prior offense and keep him in the Federal Witness Protection Program (FWPP). The plea agreement was admitted without objection. Also during the government's case-in-chief, three co-defendants (Moore, McLamb and Harbour) testified regarding their roles in the arson. They also testified that they had been convicted of the arson.
 
 
 23
 The appellant has contended that the government improperly vouched for the credibility of its primary witness, Norman, by eliciting details regarding the truthfulness provision of Norman's plea agreement on direct examination. The appellant has also suggested that the district court committed plain error by allowing evidence and permitting argument by the government tending to show that Norman had performed the agreement satisfactorily and had reaped its rewards.[2]
 
 
 24
 Vogel did not object to the district court's evidentiary rulings regarding the allegedly improper vouching of which he now complains. His failure to object below limits this court to review for plain error. United States v. Jarvis, 7 F.3d 404, 410 (4th Cir.1993), cert. denied, 114 S.Ct. 1200 (1994); FRCP 52(b). "Plain error is an exception to the general rule that entitlement to appellate review is dependent upon a party's lodging a contemporaneous objection in the tribunal of first instance." Jarvis, 7 F.3d at 410. The authority to correct plain errors under rule 52(b) "is to be applied 'sparingly' and saves only 'particularly egregious errors' in those circumstances 'in which a miscarriage of justice would otherwise result.' " Id. (citation omitted).
 
 
 25
 Improper vouching occurs when "the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir.1993). A prosecutor may not offer or elicit "explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." Id. A prosecutor's solicitation of assertions of trustworthiness from government witnesses may also be impermissible vouching. Id. Vouching is prohibited because it "invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully." United States v. Roberts, 618 F.2d 530, 536 (9th Cir.1980). There is no evidence in the record that the prosecutor offered personal assurances on behalf of Norman's truthfulness.
 
 
 26
 In United States v. Henderson, 717 F.2d 135, 138 (4th Cir.1983), cert. denied, 465 U.S. 1009 (1984), we concluded that the district court did not abuse its discretion in permitting the government to elicit details of a witness's plea agreement during the course of direct examination.[3] Here, the prosecutor asked permission of the court and of Vogel's counsel before proceeding with such questioning. Strategically, it may be to the government's advantage to elicit details potentially harmful to its witness' credibility on direct before those details are extracted on cross. The government must be careful not to indulge in rehabilitative efforts, however, before its witness is attacked.
 
 
 27
 It did not constitute error for the government to elicit details regarding the benefits Norman received for cooperating with the government. "[A]bsent an 'overt statement of personal belief and [any] insinuation that the prosecutor knew better than the jury what the truth was' ... there is nothing improper in bringing to the jury's attention the fact that the government has an agreement with one of its witnesses that requires a witness to testify truthfully." United States v. Machi, 811 F.2d 991, 1003 (7th Cir.1987). At the time of Vogel's trial, for example, Norman was participating in the witness protection program. To remain in that program, Norman understood that he was required to testify truthfully. Placing all of the evidence before the jury allows the jury members an opportunity to weigh the evidence and determine the credibility of the witnesses. Id. at 1004.
 
 
 28
 BATF Agent David Lazar testified regarding his investigation of the arson. He spoke with both Norman and Vogel during the course of that investigation. His investigation corroborated Norman's testi mony, but, as the government has argued, it did not improperly bolster or vouch for that witness's credibility. Under Lewis, the government has the "right to explain its procedures and the relationship between the Government and its witnesses." Lewis, 10 F.3d at 1089.
 
 
 29
 The court did not abuse its discretion in permitting the challenged testimony.
 
 CO-DEFENDANTS' CONVICTIONS
 
 30
 The appellant has argued that the court committed plain error by admitting evidence that Vogel's co-defendants were convicted of the same charges in an earlier jury trial based on Norman's testimony. He has contended that admission of the evidence violated both Federal Rule of Evidence 608(b) and Vogel's Sixth Amendment right to a trial by jury.
 
 
 31
 Under Federal Rule of Evidence 608(b), "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence." In United States v. Taylor, 900 F.2d 779, 781-82 (4th Cir.1990), the government introduced evidence that its star witness had given "reliable" testimony that had led to convictions in other, unrelated cases, and it argued that the jury should believe its star witness because other juries had done so in the past. In Taylor, we held that introducing convictions obtained in other cases in which a testifying witness had testified in an effort to bolster or rehabilitate that witness's credibility violates Rule 608(b).
 
 
 32
 The government did not engage in such conduct in the instant case, however. The prosecutor did not tell the jury that it should convict Vogel on the strength of Norman's testimony merely because other juries had convicted Moore, McLamb and Gregory after Norman testified against them. The prosecutor elicited testimony regarding the co-defendants' convictions during their own testimony to soften the impeachment anticipated on cross.
 
 
 33
 The court gave the jury a limiting instruction, emphasizing that the jury was not to consider the co-defendants' convictions as evidence of Vogel's guilt. Because jurors are presumed to follow their instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), we should assume that they did so absent any evidence to the contrary. Vogel has not presented any evidence that would tend to prove that the jury found Vogel guilty based on the testimony from other individuals who had been found guilty.
 
 
 34
 Vogel has also asserted that the admission of the co-defendants' convictions violated his Sixth Amendment rights because knowledge of those convictions invited the jury to find him guilty by association. In United States v. Blevins, 960 F.2d 1252, 1260-61 n. 3 (4th Cir.1992), we rejected a challenge to the admission of testifying codefendants' guilty pleas finding that the appellants had the opportunity to cross-examine them and that
 
 
 35
 the government was justified in eliciting testimony as to their pleas in anticipation of impeachment of the witnesses on that basis. If there was any error, however, it was rendered harmless by the district court's instruction to the jury at the end of the trial that they were not to consider the guilty pleas of the testifying co-defendants as substantive evidence against [the accused].
 
 
 36
 Id. Accord, United States v. Griffin, 778 F.2d 707, 711 n. 5 (11th Cir.1985) (where a co-defendant takes the witness stand, evidence of a guilty plea may be introduced to help the jury in assessing the credibility of that co-defendant). The fact that these co-defendants did not plead guilty, but rather, were convicted, does not change the Blevins analysis. Both pleas and convictions result in convictions. Griffin, 778 F.2d at 711 ("[t]here is no appreciable difference between informing a jury that a cohort has pleaded guilty and informing it that a cohort has been adjudicated guilty").[4] Again, the court in the instant case instructed the jury that the convictions were not to be considered as evidence of Vogel's guilt, but only as an indication of the codefendants' credibility.[5]
 
 Testimony on the Bankruptcy Proceedings
 
 37
 Vogel has contended that the court committed plain error by admitting expert testimony on questions of bankruptcy law, the legal significance of court orders, and other events in his pending bankruptcy proceeding. Vogel has asserted that the admission of such evidence affected his substantial right to have his guilt determined in a trial in which the judge states the law and the jury determines whether the defendant committed the requisite acts with the requisite states of mind. Because the defense counsel did not object at the trial, we may review only for plain error. United States v. Gastiaburo, 16 F.3d 582, 587 (4th Cir.1994), petition for cert. filed, April 29, 1994 (No. 93-8903).
 
 
 38
 The insurance proceeds forwarded to Vogel as a result of the fire, which he used to pay off his creditors, inured to his personal benefit, albeit indirectly. Vogel had filed for bankruptcy under Chapter 11, and he was under an obligation to comply with his reorganization plan by making payments to creditors. It was the government's theory of the case that Vogel had his house burned down in order to acquire the proceeds and pay off his creditors. To establish the validity of the proposed motive, the government had to present evidence to the jury showing why it would benefit Vogel to pay off his creditors in compliance with the Chapter 11 reorganization plan. Assuming a group of average citizens who may not have been involved in bankruptcy proceedings prior to their service on the jury, the government had to provide testimony that would elucidate the bankruptcy process, the difference between Chapter 11 and Chapter 7, and the ways in which Vogel would benefit by paying his creditors. See, Note, Expert Legal Testimony, 97 Harv. L.Rev. 797 (1984) (arguing that expert legal testimony, like other expert testimony, should be admissible when helpful under Rule 702).
 
 
 39
 Vogel has argued that a witness may not give an opinion or conclusion on a question of law and that Rule 704(a), which allows opinions on ultimate issues, "was not intended to allow experts to offer opinions embodying legal conclusions." The "expert" testimony on the bankruptcy proceedings offered by the government's witnesses did not constitute opinions as to legal conclusions relevant to Vogel's criminal charges.[6] Adalman v. Baker, Watts & Co., 807 F.2d 359, 368 (4th Cir.1986) and United States v. Zipkin, 729 F.2d 384, 387 (6th Cir.1984) are not to the contrary. Adalman proscribed an expert witness's testimony regarding the meaning and applicability of the securities law to the transactions at issue before the court. The testimony at issue in Adalman constituted the expert's opinion on the governing law. In Zipkin, the Sixth Circuit held improper and prejudicial the testimony provided by a bankruptcy judge as to a question of bankruptcy law in a case concerning the allegedly fraudulent appropriation of funds from a bankrupt estate by the receiver of that estate.
 
 
 40
 Vogel has claimed that the court's admission of "expert" testimony on bankruptcy law during his criminal trial, despite the lack of objection thereto, constituted plain error because it deprived him of the right to have his guilt determined at a trial in which the judge stated the law. In no event would the judge in the instant case have instructed the jury on bankruptcy law. Had the court done so, the jury would have been utterly confused because the charges against Vogel were criminal charges of arson. As such, the admission of testimony on bankruptcy law and Vogel's bankruptcy proceedings did not constitute legal conclusions designed to usurp the function of the trial court in a manner contemplated in Adalman.[7] The bankruptcy issues were not relevant to ultimate conclusions of law, but rather were evidentiary matters relevant to the factual framework underlying the government's theory of the case. Had the jury been unable to understand the bankruptcy procedures and technicalities, the jury would have been unable to understand the tenor of the government's argument. Any testimony that assists the trier of fact is permissible as expert testimony. Federal Rule of Evidence 702.
 
 
 41
 Vogel also has argued that, in a trial for charges arising out of burning a building, it was plain error for the court to admit a government auditor's opinion that the defendant had a motive to cause the fire. Vogel has characterized motive as a psychological concept akin to intent and states that the auditor's testimony on that topic constituted an ultimate legal conclusion. The government has argued that the auditor's testimony went to the state of Vogel's finances, not to the state of his mind.
 
 
 42
 Diana Galloway, an auditor employed by the BATF, had a B.A. in accounting and math, had been an auditor for 27 years, and had performed reviews of financial records in relation to arson investigations for the previous eight years "to determine whether there [was] ... a financial motive to commit the arson and collect the insurance proceeds." She was not formally admitted as an expert, but she testified as an expert in the form of an opinion. She reviewed Vogel's finances and concluded that he did have a financial motive to collect the insurance proceeds because, at the time of the fire, he was behind in his payments under the Chapter 11 plan.
 
 
 43
 All of the testimony admitted regarding the bankruptcy proceedings was appropriate. Rule 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine the fact in issue." The Rule" is broadly interpreted, and helpfulness to the trier of fact is its 'touchstone.' " Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir.1993). As the government has argued, the testimony at issue here was admissible because it was helpful to the jury: "Expert testimony on bankruptcy law was essential for the jury to intelligently evaluate Vogel's financial situation and his motive to commit the arson-for-profit charged in the indictment." The district court's admission of all of the foregoing testimony regarding Vogel's bankruptcy proceedings was not clearly erroneous and did not constitute plain error.
 
 Interstate Commerce Issues
 
 44
 The defendant has argued that, in a trial for charges of burning a building used in interstate commerce in violation of 18 U.S.C. Sec. 844(i), it was error for the court to conclude as a matter of law that the building, a private residence, was used in interstate commerce. Because it raises a legal issue, we review the district court's decision de novo.
 
 
 45
 The federal arson statute applies to the arson of "any building" that is "used in interstate or foreign commerce"; it is not limited to commercial buildings. Vogel has suggested that the legislative history reflects no intent whatsoever that Sec. 844(i) wholly subsume state arson law by covering purely private homes. Moore, McLamb and Gregory made such an argument during the course of their appeal, and we rejected it, relying on United States v. Ramey, 24 F.3d 602, 606-07 (4th Cir.1994). United States v. Moore, 25 F.3d 1042 (4th Cir.1994) (Table) (text in 1994 WL 251174, Ca. No. 93-5273 (4th Cir. June 10, 1994)). In Ramey, we held that connection of a house to an interstate power grid constitutes a sufficient use in an activity that affects commerce to satisfy the arson statute. Vogel testified at trial that his beach house was connected to interstate gas and telephone lines, had been renovated using materials that had travelled in interstate commerce, was insured by an out-of-state insurance company, and was an asset under the control of the United States Bankruptcy Court.
 
 
 46
 Vogel has recommended that we adopt a bright line rule according to which privately owned homes used solely as private residences, would not fall within the scope of the statute. That is in conflict with Ramey.
 
 
 47
 Even assuming that we will not adopt the proposed bright line rule, appellant has argued that the court erred by deciding the issue as a matter of law and presenting its conclusion to the jury, thereby removing from the prosecution the burden of proving that element of the crimes charged. Although the issue is a jurisdictional one, and therefore presents a question of law for the court, Vogel has argued that the underlying facts should have been submitted to the jury. Because the jury was not allowed to consider one of the essential elements charged in Counts Nine and Eleven, Vogel has contended that the jury's verdict is incomplete and should be reversed. Actually, the court based its conclusion that the jurisdictional prerequisite had been met on the "stipulated facts" of the case. Because of the stipulation, there were no evidentiary factual determinations to be made by the jury regarding the jurisdictional question. The court did not commit plain error by concluding that the beach house constituted a building in interstate commerce for the purposes of the federal arson statute.
 
 The Verdict Form
 
 48
 The appellant has argued that the verdict form constituted plain error. The verdict form submitted to the jury read as follows:
 
 WE, THE JURY, FIND AS FOLLOWS:
 
 49
 We, the jury, find unanimously, and beyond a reasonable doubt, that defendant Daniel A. Vogel is
 
 NOT GUILTY
 GUILTY
 
 50
 of the charges alleged against him in Count I of the Indictment.
 
 
 51
 Not guilty/Guilty blanks for each of the eleven other counts followed and the form included a signature line for the foreperson. Vogel has argued that the form required the jury to find him not guilty beyond a reasonable doubt in order to find him not guilty. Appellant has urged that the way the form was worded deprived him of the benefit of the proposition that a reasonable doubt as to a defendant's guilt can arise from an insufficiency of the evidence.
 
 
 52
 The defendant did not object to the wording of the verdict form, but the record indicates that the form went directly from the judge to the jury without being submitted to counsel for examination. Vogel has maintained that an instructional error that misdescribes the burden of proof "vitiates all the jury's findings." Appellant has suggested that the guilty verdicts contained on that form should be reversed because they constitute a deprivation of the defendant's due process right. Vogel's legal argument regarding the vitiation of the jury's findings need not be addressed because the underlying interpretation of the verdict form on which that argument is based is not persuasive.
 
 
 53
 Vogel's point that the jury instructions were both incorrect and carelessly worded is well-taken. The instructions at issue should not have been used. Whether such an error amounts to a miscarriage of justice is, however, another matter. Vogel's argument is, essentially, a semantic one. On the verdict form, the jury found Vogel guilty of the counts charged "beyond a reasonable doubt." Vogel has argued that the jury may have found Vogel guilty only because it could not find him "not guilty beyond a reasonable doubt." Such an interpretation of the jury's decision does not follow logically from Vogel's semantic construction of the verdict form. According to Vogel's interpretation of the verdict form, the jury had to find that Vogel was either (1) GUILTY beyond a reasonable doubt, or (2) NOT GUILTY beyond a reasonable doubt. In other words, it is conceivable, based on the wording of the verdict form, that the jury could have been incapable of making either finding. Therefore, the jury's inability to find Vogel NOT GUILTY beyond a reasonable doubt does not have as its corollary an inevitable finding of guilt. Rather, the way the verdict form is worded, any finding made by the jury was required to be beyond a reasonable doubt. In the case of Counts 1-6 and 9-12, the jury found Vogel guilty beyond a reasonable doubt as it indicated on the verdict form. The semantic argument put forth by Vogel, therefore, is internally inconsistent and, in the end, unpersuasive. The jury clearly found Vogel guilty beyond a reasonable doubt under any construction of the verdict form.
 
 Merging of Counts
 
 54
 Vogel has argued that his convictions for arson in violation of 18 U.S.C. Sec. 844(i), Counts 9 and 11, merged with his convictions for using fire to commit a felony in violation of 18 U.S.C. Sec. 844(h), Counts 10 and 12. By calculating the guidelines and entering its judgment on Counts 10 and 12, Vogel alleges that the court subjected him to being twice punished for the same conduct in violation of the Double Jeopardy clause of the Fifth Amendment. Vogel did not challenge the Counts by motions to dismiss, so review is limited to review for plain error. United States v. Jarvis, 7 F.3d 404 (4th Cir.1993), cert. denied, 114 S.Ct. 1200 (1994).
 
 
 55
 The indictment did not identify the federal felony underlying Counts 10 and 12. The jury instructions, however, specifically identified mail fraud as the predicate felony Vogel was alleged to have committed using fire. The jury's verdict simply said that Vogel was guilty of the charges alleged in Counts 10 and 12. Despite the explicit jury instructions, Vogel has contended that the guilty verdicts on Counts 10 and 12 may, in fact, have been based on the same elements as the guilty verdicts on the parallel Counts 9 and 11 because the indictment's allegation of the Count 10 and 12 offenses did not identify the federal felony in the course of which fire was used. In other words, the jury may have concluded that, on two occasions, he used fire to damage a building used in interstate commerce. Such a verdict would violate the double jeopardy clause because that clause prohibits multiple punishments for the same offense.
 
 
 56
 Vogel's highly speculative argument must fail for two reasons. First, a jury is presumed to follow its instructions, and the court clearly instructed the jury that the predicate felony for Counts 10 and 12 was mail fraud. Richardson v. Marsh, 481 U.S. 200, 211 (1987). The silence of the indictment does not negate the effect of the instructions. Vogel has presented no evidence to suggest that the jury failed to follow its instructions in this case. Second, Congress may prescribe multiple punishments for the same conduct. Under Blockburger v. United States, 284 U.S. 299, 304 (1932):
 
 
 57
 The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 58
 As Vogel has conceded, the offenses described bySec. 844(i) and Sec. 844(h)(1) do not share identical elements and are not the same offense under the Blockburger test. "In general, double jeopardy bars a succeeding prosecution if the proof actually used to establish the first offense would suffice to convict the defendant of the second offense." Jarvis, 7 F.3d at 410.
 
 
 59
 The government would appear to agree that, if arson were used as the underlying offense for counts 10 and 12, the convictions on Counts 9 and 11 as well as 10 and 12 would constitute double punishment for the same conduct: committing arson and using fire to commit arson. The government has steadfastly maintained, however, and the jury instructions indicate, that mail fraud constituted the underlying offense for Counts 10 and 12, and Vogel has not presented any evidence that would persuade us to the contrary. The convictions on Counts 9 and 11, 10 and 12 are, therefore, affirmed, as are the sentences that were calculated on the basis of those convictions.
 
 Sentencing Guideline Errors
 
 60
 Vogel has raised three specific errors which he believes the district court committed in the sentencing process. These errors involve the following subjects: the district court's decision not to group the arson counts, the knowing creation of a substantial risk of death or bodily injury, and Vogel's aggravating role in the offense. The district court did not err in applying the Sentencing Guidelines, and we affirm Vogel's sentence.
 
 Grouping
 
 61
 The Guidelines provide that, when a defendant is convicted of multiple counts, all "counts involving substantially the same harm shall be grouped together into a single Group" for sentencing purposes. U.S.S.G. Sec. 3D1.2. Under the same-harm rule, "counts involve substantially the same harm" when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. Sec. 3D1.2(b). Vogel has argued that the district court erred by failing to group the counts of arson, and, consequently, the court should not have given him a two level increase. Gregory, one of the defendants convicted for his participation in the arson at issue in this case, made a similar argument on his appeal.
 
 
 62
 As did Gregory, Vogel has argued that there was only one victim of his crime--Aetna Casualty and Surety Co. As did Gregory, Vogel has also argued that the unsuccessful and successful arson attempts constituted one common scheme or plan: to defraud Aetna by destroying the residence and collecting the proceeds. In Moore, an unpublished opinion, we held that the district court's decision not to group Stephen Gregory's counts of arson was not clearly erroneous since two separate risks of harm were involved. Vogel, like Gregory, was involved in criminal activity constituting multiple, separate risks of harm, not one of composite harm.
 
 
 63
 As the government has noted in the instant case, two discrete, unsuccessful arson attempts were followed by a successful arson. The second attempt involved a difference in time and different actors than the first. The district court found that there were three break-ins and two attempted arsons and that the arson itself constituted multiple risks of harm rather than one composite harm. The first involved 10 to 20 gallons of gasoline and C4 explosives; the second involved 10 gallons of gasoline and flares; and the third, successful arson was accomplished by undetermined means. As in Moore, we find that the district court's determination that the offenses should not be grouped was not clearly erroneous.
 
 Serious Risk of Death or Injury
 
 64
 The court sentenced the defendant under the arson guideline Sec. 2K1.4(b)(1). Section 2K1.4(b)(1) reads as follows:
 
 
 65
 (b) Specific Offense Characteristics
 
 
 66
 If more than one applies, use the greatest: (1) if the defendant knowingly created a substantial risk of death or serious bodily injury, increase by 18 levels.[8]
 
 
 67
 Vogel has claimed that it was error for the court to increase his offense level by 18 levels based on the conclusion that he "knowingly created a risk of serious injury" when there was no evidence that he had knowledge of the risk, and the court failed to make any findings as to his knowledge of the risk. Vogel has argued that Sec. 2K1.4(b)(3) should apply: "If the offense involved destruction or attempted destruction of a residence increase by 12 levels." We will not disturb the district court's factual finding that Vogel knowingly created a substantial risk to others unless that court's finding is clearly erroneous. United States v. Markum, 4 F.3d 891, 896-97 (10th Cir.1993) (affirming 18-level enhancement under Sec. 2K1.4(b)(1) where a fire was set with gasoline during business hours and the ferocity of fire and risk of explosion put firefighters in severe jeopardy).
 
 
 68
 Vogel has suggested that Sec. 2K1.4(b)(1) may be applied only when the court reaches the following two conclusions: 1) that a substantial risk of death and serious bodily injury was created; and 2) that the risk was knowingly created by the defendant. Vogel has argued that the evidence and findings were insufficient to establish the second factor: that he knowingly created the risk. Norman testified that he and Moore told Vogel at the beach house that they planned to use C4 explosives to detonate gasoline. Although he was made aware that C4 explosives would be used to accomplish the destruction of the house, Vogel has asserted that no evidence tends to show that he knew that C4 explosives would create a substantial risk of death and serious bodily injury. At the worst, Vogel claims he should receive a 14 level increase under the reckless endangerment provision,Sec. 2K1.4(b)(2).[9]
 
 
 69
 The government has argued that "the facts of this case as far as risk or danger speak[ ] for [themselves,]" and there is no need to reiterate all of the evidence in the record that supports that assertion. Vogel engineered an arson in a residential area accomplished with C4 explosives and gasoline. As we noted in Moore, Vogel's neighbors and the firefighters who responded to the fire were all placed at substantial personal risk as a result of the rapid burning of the gasoline soaked home. The district court's finding that Vogel knowingly created a substantial risk of death or serious bodily injury by having his house burned down using C4 explosives and gasoline was not clearly erroneous. That conclusion mirrors the determination to the same effect in Moore.
 
 Aggravating Role
 
 70
 The court increased Vogel's offense level by four levels (from 24 to 28) pursuant to Sec. 3B1.1(a) for the aggravating role he played in the offense. Section 3B1.1(a) reads as follows: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by four levels." To determine whether this section applies to a particular defendant a court should consider the following relevant factors set forth in Application Note 4: the exercise of decision-making authority; the nature of participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning or organizing the offense; the nature and scope of the illegal activity; and the degree of control or authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. Sec. 3B1.1, Comment., Applic. Note 4.
 
 
 71
 Vogel has suggested that the arson and the conspiracy to commit that crime were not extensive within the meaning of the guideline. He has also argued that, at the most, he knew of and/or procured the participation of only Moore and Norman and that he did not plan, organize, or recruit others in furtherance of the scheme to burn his house.
 
 
 72
 Five or more people were, however, involved in the criminal scheme (including Vogel, Moore, McLamb, Norman, Harbour, and Gregory), and Vogel concedes that much. Vogel organized the plan to burn down his beach front home regardless of the fact that he did not personally solicit the services of each of those participants. The evidence adduced at trial showed that Vogel: conceived of and controlled the plan to burn his house down; hired Moore and Norman to carry it out; helped them prepare by meeting with them in South Carolina to show them the house; dictated the timing of the offense; was entitled to 90% of the profit; and defrauded his insurance company out of over one and a half million dollars. Vogel obtained the services of Moore and Norman by offering to pay them. Because the insurance policy was in Vogel's name, he had control over the payment for services rendered.
 
 
 73
 The court did not err in concluding that Vogel was a leader or organizer of the criminal activity under Sec. 3B1.1(a), and, therefore, we affirm.
 
 Restitution
 
 74
 Finally, Vogel has asserted that it was error for the court to order restitution without explicitly considering his ability to pay in violation of the mandatory methodology set forth in United States v. Bruchey, 810 F.2d 456, 459 (4th Cir.1987) and reiterated and applied in United States v. Plumley, 993 F.2d 1140, 1142-43 (4th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 279 (1993). Vogel has argued that the court made no realistic findings regarding Vogel's ability to pay and no effort to key his ability to pay to the restitution ordered. Vogel did not object to the restitution order in the proceedings below, and thus, we review the decision for plain error. Despite his failure to object, appellant argues that the case should be remanded for resentencing.
 
 
 75
 "In order to assure effective appellate review of restitution orders, this circuit requires sentencing courts to make specific, explicit findings of fact on each of the factors set forth inSec. 3664(a)" of the Victim and Witness Protection Act of 1982, 18 U.S.C. Secs. 3663-64 (West 1985 & Supp.1993). United States v. Molen, 9 F.3d 1084, 1086 (4th Cir.1993) (citing Bruchey and Plumley ). "Further, these findings of fact must key a defendant's financial resources, financial needs, and earning ability to the type and amount of restitution." Molen, 9 F.3d at 1086 (citing Bruchey ). To justify restitution, the court must conclude that the defendant can feasibly comply with the order without undue hardship to himself or to his dependents. Id.
 
 
 76
 Molen is particularly important to the disposition of the instant case because in that case we wrote that the district court could meet the foregoing requirements by "adopting a presentence report that recites adequate recommended findings." Id. As we noted in Molen, such an approach allows the court to determine the resolution and treatment of the factors by the district court and to conduct an effective review of the restitution order.[10] Id. at 1086-87.
 
 
 77
 As Molen makes clear, then, it is not inappropriate or, inadequate per se, to adopt the findings contained in the presentence report. In the instant case, the presentence report carefully detailed Vogel's financial condition and ability to pay in paragraphs 115 through 124. That report indicated assets of $13,159,300 (including two apartment complexes, a life insurance policy, two cars, mortgages held as mortgagee, and personal property) and liabilities of $8,140,158 (including those assets and liabilities shared by his wife), leaving Vogel with a Net Worth of $5,019,142. His total monthly income was reported as $8,000 and his total necessary monthly expenses as $6,082 including minimum installment payments due to protection under Chapter 11 (Vogel filed for Chapter 11 protection in Miami, Florida on August 5, 1992). The report also indicated with respect to his family's needs and potential hardship, that Vogel's parents are deceased and his children are adults.
 
 
 78
 At the beginning of the hearing, the court asked Vogel which paragraphs of the sentencing report he objected to, and Vogel responded "15, 16, 17, 19, 31, 36, 102, 70 and 76." None of those paragraphs fell under the "Financial Condition: Ability to Pay" section of the report. The court said, "But the remainder of the paragraphs in the pre-sentence report you have no objection to and I'm going to adopt those for purposes of sentencing; is that all right?" Counsel responded, "That's correct, Your Honor." The court did not make additional findings regarding Vogel's ability to pay. The court ordered Vogel to pay the total amount of restitution over a period of three years while he was on supervised release after he was released from prison. Vogel was 58 years old at the time of trial and was sentenced to ten years in prison. Vogel did not object to the court's findings or to the imposition of restitution, which, given his assets and net worth, would seem to be feasible.
 
 CONCLUSION
 
 79
 For the foregoing reasons, we affirm the district court's conviction of Vogel and reject each of Vogel's claims of error.
 
 
 80
 AFFIRMED.
 
 
 
 [1]
 Vogel's co-defendants--Larry Moore, Stephen Gregory, Philip McLamb, and Alison Harbour--were tried separately and were convicted. Moore, McLamb, and Gregory appealed their convictions and, in a decision issued June 10, 1994, we affirmed the convictions of all three defendants. United States v. Moore, 25 F.3d 1042 (4th Cir.1994) (Table) (text in 1994 WL 251174, Ca. No. 93-5273, slip op. at p. 8 (4th Cir. June 10, 1994)). The issues raised by Vogel which were also raised and disposed of during his co-defendants' appeal are noted accordingly
 
 
 [2]
 Vogel has claimed that the government vouched for Norman in the following ways: 1) introducing evidence that Norman was testifying pursuant to a plea agreement and that he had been placed in a witness protection program under the terms of that agreement; 2) arguing that the agreement gave Norman an incentive to tell the truth; 3) demonstrating that his pre-trial statements to the Bureau of Alcohol, Tobacco, and Firearms (BATF) were confirmed by independent investigation; and 4) eliciting from co-defendants the fact that they were convicted in a prior trial at which Norman testified for the government
 
 
 [3]
 In that case, there was no evidence that the government derived any improper advantage from the witness's testimony concerning his promise to be truthful. The prosecutor's questions did not imply that he had special knowledge of the witness's veracity, and the promise was not disproportionately emphasized or repeated. Id
 
 
 [4]
 In Griffin, the court held that informing the jury that an absent codefendant had been adjudicated guilty constituted an abuse of discretion. Id. at 711. Likewise, informing a jury of an absent co-defendant's guilty plea would be inappropriate
 
 
 [5]
 "Ladies and Gentlemen of the jury, as you just heard, and you will hear evidence that some witnesses have been convicted of the crimes which arose out of the same events for which the defendant is on trial here. You must not consider those convictions as any evidence as to this defendant's guilt. You may consider those witnesses' convictions only for the purposes of determining how much, if at all, to rely on their testimony and for the purpose of showing their acknowledgement of the participation of the offenses for which they were convicted."
 
 
 [6]
 The government has suggested, in any event, that Philip Wall, a court-appointed examiner in Vogel's bankruptcy case, and William Yaeger and Robert Price, two bankruptcy attorneys who served as counsel to some of Vogel's creditors, did not testify as experts. They merely recounted certain factual events that occurred during Vogel's bankruptcy proceedings
 George Cauthen, an expert in the field of bankruptcy law, did testify as an expert after reviewing Vogel's bankruptcy file. He testified that the Chapter 11 reorganization plan required a balloon payment to one of the creditors and that, in his opinion, Vogel did not have the resources to make that payment. If he was unable to make the payment, his Chapter 11 proceeding would have failed and would have been converted into an involuntary Chapter 7 proceeding in which all of Vogel's assets would have been immediately liquidated to pay off the creditors.
 
 
 [7]
 In that case, a suit alleging violations of the securities laws and breach of contract, while it may have been permissible for a legal expert to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the Securities and Exchange Commission, the expert was not permitted to give an opinion as to the legal standards he believed to govern the parties' conduct or his expert opinion on the governing law. Adalman, 807 F.2d at 367-68
 
 
 [8]
 The next two paragraphs of Sec. 2K1.4(b) read as follows:
 (2) If the defendant recklessly endangered the safety of another, increase by 14 levels.
 (3) If the offense involved destruction or attempted destruction of a residence, increase by 12 levels.
 Section 2K1.4(b)(1) was deleted and replaced as of November 1, 1990. See Appendix C, Note 330. The analogous provision,Sec. 2K1.4(a)(1), now reads:
 (a) Base Offense Level (Apply the Greatest):
 (1) 24, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B)involved the destruction or attempted destruction of a dwelling.
 
 
 [9]
 In Moore, defendant Gregory, Vogel's co-conspirator, argued that he did not knowingly create a substantial risk of death or serious bodily harm. In that case, we emphasized that "[i]t is the creation of risk, not the actual consequences of the defendant's action, that triggers the enhancement under Sec. 2K1.4(b)(1)." United States v. Moore, Ca. No. 93-5273, slip op. (4th Cir. June 10, 1994)
 
 
 [10]
 In Molen, the district court adopted the findings in the presentence report, but we found those findings incomplete and inadequate to satisfy the clear mandate of Bruchey that explicit factual findings be made. In Molen, the presentence report did not contain findings as to the individuals' or families' financial needs and potential hardship, nor did it offer findings that would key the amount of restitution to the Molens' ability to pay. In addition, one of the defendant's future earning capacity was not discussed
 We vacated the restitution order and remanded to the district court for explicit findings.