Case remanded and vacated by
Supreme Court order dated 12/4/00

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                      No. 98-4532

LUDENCE ALFORD TURNBULL, JR.,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

KEITHROY NOEL CLARKE, a/k/a
                                                                        No. 98-4583
Michael St. Clair Davis, a/k/a
Tyrone Roberts, a/k/a Capone, a/k/a
"Ť", a/k/a Khadafi,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca B. Smith, District Judge.
(CR-97-166)

Argued: March 3, 2000

Decided: May 2, 2000

Before WILKINSON, Chief Judge, and WILLIAMS
and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Paula Xinis, Assistant Federal Public Defender, Baltimore, Maryland, for Appellant Clarke; Stanley E. Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellant Turnbull. Robert Edward Bradenham, II, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant Clarke. Helen F. Fahey, United States Attorney, Laura Pellatiro Tayman, Assistant United States Attorney, Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Ludence Turnbull and Keithroy Clarke were convicted by a jury of conspiracy to import cocaine and cocaine base, conspiracy to distribute cocaine and cocaine base, conspiracy to launder money, and related offenses. Turnbull and Clarke appeal their convictions and resulting sentences, alleging error at various aspects of the pretrial, trial, and sentencing phases of the criminal proceeding against them. For the reasons that follow, we find no merit to their challenges. We, therefore, affirm Turnbull's and Clarke's convictions and sentences.

I. FACTUAL BACKGROUND

Viewed in the light most favorable to the Government, see Evans v. United States, 504 U.S. 255, 257 (1992), the evidence adduced at trial showed the following facts. In September 1994, Eugene Smalls (Eugene), Angel Ventura, and other co-conspirators began importing cocaine from St. Thomas to the Norfolk, Virginia area. Initially, the conspirators transported the cocaine on commercial flights through unaccompanied baggage placed on the plane by a member of the St.

2

Thomas National Guard, and they sent couriers to baggage claim to pick up the cocaine once it arrived in Virginia. Once the cocaine arrived in Virginia, it was converted into crack cocaine and provided to local distributors.

One of Eugene's local distributors was Ludence Turnbull. According to Ventura, Eugene gave Turnbull a discount because Turnbull was from the Virgin Islands. In January 1995, Ernest McNair, another one of Eugene's distributors, went to Eugene's residence in Virginia Beach to purchase crack cocaine from Eugene. Eugene told McNair to wait. While McNair was waiting, Turnbull arrived, carrying a little brown purse. According to McNair, Turnbull went into the back room and Eugene followed. After four or five minutes, Eugene returned and gave McNair a kilogram of crack cocaine. McNair testified that because Eugene told him that he would have to wait, he surmised that Eugene did not have any crack cocaine prior to Turnbull arriving.

When some of the cocaine was stolen from a bag placed on a plane from St. Thomas to Virginia, the conspirators began to look for alternative methods to transport the cocaine. At the suggestion of Keithroy Clarke and Eugene's brother, Mitchell Smalls (Mitchell), the conspirators began in early 1995 to use women's purses to hide the cocaine before shipping the cocaine via Federal Express. Matters soon took a turn for the worse. In September 1995, unbeknownst to the conspirators, McNair began to cooperate with the Virginia Beach Police Department. Over the next several months, McNair recorded conversations with Eugene concerning purchases of cocaine. McNair also participated in a videotaped purchase of a kilogram of crack cocaine from Eugene and other co-conspirators. Shortly thereafter, law enforcement officials arrested Eugene and three other co-conspirators at Eugene's home.

Despite the arrest of Eugene, importation of cocaine from St. Thomas into Virginia continued in 1996, with the means of importation shifting to body-smuggling by human couriers. In early 1996, Yvette Westbrook agreed to make a trip to St. Thomas to obtain drugs for the conspiracy. Clarke and Mitchell explained to Westbrook that she would be paid $1,300 for bringing back one kilogram of cocaine. In May 1996, Turnbull obtained Westbrook's airplane ticket and drove her to the airport. After Westbrook successfully smuggled the

3

cocaine on her body, Turnbull picked up Westbrook at the Norfolk airport and took her to her apartment. While Turnbull waited in the living room of Westbrook's apartment, Westbrook placed the cocaine into a duffel bag. Westbrook gave the duffel bag containing cocaine to Turnbull, who then left the apartment. Later that day, Clarke came by Westbrook's apartment and paid her the agreed-upon $1,300 for smuggling the cocaine.

After witnessing Westbrook successfully smuggle drugs, Quichelle Martin, Westbrook's roommate, agreed to smuggle drugs for the conspiracy. Clarke gave Martin the money for the airline tickets, and Clarke and Turnbull drove Martin to the airport to purchase the tickets. The morning of her trip, Turnbull drove Martin to the airport. Unfortunately for the conspirators, Martin's trip to St. Thomas was not as successful as Westbrook's. At the St. Thomas airport, Customs officials pat-searched Martin, discovered the kilogram of cocaine, and arrested Martin.

At the same time that the conspirators were importing drugs from St. Thomas into Virginia, they were wiring money via Western Union between those two places to facilitate the purchase of drugs in St. Thomas and the operations of the conspiracy in the United States. Cleon Procope testified that in 1995 he received checks in St. Thomas from Turnbull and Mitchell in Virginia. Procope also testified to sending checks to Turnbull in Virginia on four separate occasions in 1995. In 1996, the conspirators began to recruit individuals to transfer money to St. Thomas via Western Union in order to conceal the true identity of the sender and receiver of the money. Monica Tucker testified to receiving money from Turnbull and sending it to various individuals in St. Thomas, including Akebo Thomas and Milton Barnes, and to receiving money on Turnbull's behalf. Tonya Watts, Shara Hawley, and Linda Cannon also testified to sending money to St. Thomas for Turnbull. Akebo Thomas testified that on numerous occasions in 1995 and 1996 he would receive Western Union wire transfers in St. Thomas from various individuals, including Monica Tucker, which he would cash and deliver to Mitchell. Milton Barnes and Aisha Snipes also testified to receiving money for Mitchell. The majority of these testified-to transactions occurred around and during May 1996, the same time period as the trip by Westbrook to St. Thomas to smuggle drugs for the conspiracy.

4

In November 1997, Turnbull was arrested by federal law enforcement officials in Norfolk for his involvement in the drug conspiracy. One month later, federal law enforcement officials arrested Clarke in New York. Turnbull and Clarke were charged in a twenty-five count indictment in the United States District Court for the Eastern District of Virginia along with eleven co-defendants.**1** Count One charged Turnbull, Clarke, and eight co-defendants with conspiracy to import cocaine and cocaine base from St. Thomas, U.S. Virgin Islands, in violation of 21 U.S.C.A. § 963 (West 1999); Count Two charged Turnbull, Clarke, and nine co-defendants with conspiracy to distribute cocaine and cocaine base, in violation of 21 U.S.C.A. § 846 (West 1999); and Count Three charged Turnbull, Clarke, and six co-defendants with conspiracy to launder money, in violation of 18 U.S.C.A. § 1956(h) (West Supp. 1999). In addition, Count Twenty-Three and Twenty-Four charged Turnbull and Clarke with importation of cocaine from St. Thomas, in violation of 21 U.S.C.A. §§ 952, 960 (West 1999), and attempted importation of cocaine from St. Thomas, in violation of 21 U.S.C.A. §§ 952, 960, 963, respectively. Count Twenty-Five charged Clarke with an additional count of attempted importation of cocaine from St. Thomas. Turnbull was also charged with six counts of money laundering (Counts Seven, Nine, Twelve, Thirteen, Seventeen, and Nineteen) and Clarke was also charged with nine counts of money laundering (Counts Eight, Ten, Eleven, Fourteen, Sixteen, Eighteen, Nineteen, Twenty, and Twenty-Two), in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (West Supp. 1999).

The trial commenced on March 16, 1998. At trial, the district court denied Turnbull's motion for judgment of acquittal on Counts One, Two, and Three. On April 6, 1998, the jury returned its verdict. The jury convicted both Clarke and Turnbull of Counts One, Two, Three, and Twenty-Three. The jury also convicted Clarke of Counts Twenty-Four and Twenty-Five, but acquitted him on all the money laundering counts for which he was indicted.**2** The jury also convicted Turnbull

_____

**1** According to the Government, nine of the co-defendants pleaded guilty, one died, and one is a fugitive. Turnbull and Clarke are the only defendants to appeal their convictions or sentences.
**2** The district court granted Clarke's motion for judgment of acquittal on Count Ten.

5

on all the money laundering counts for which he was indicted, but acquitted him on Count Twenty-Four. The district court sentenced Turnbull to 400 months of imprisonment and Clarke to 293 months of imprisonment. Turnbull and Clarke filed timely notices of appeal.

In a consolidated brief, Turnbull and Clarke assert a number of grounds for reversal on appeal. With regard to the pretrial proceedings, Turnbull argues that the district court erred in denying his motion for severance and Clarke argues that the district court erred in denying his motion to substitute retained counsel. As to the trial, Turnbull argues that the evidence was insufficient to sustain his conviction on Counts One, Two, and Three of the indictment, which charged a single conspiracy, and that the district court erred in admitting several Western Union wire transactions to which neither the sender nor receiver testified.[3] Clarke argues that the prosecutor impaired Clarke's substantial rights by vouching for, and bolstering

_____

[3] Turnbull also argues that the district court erred in admitting the following evidence: (1) Ernest McNair's testimony that Turnbull provided drugs to Eugene Smalls to sell to McNair, (2) Quichelle Martin's testimony that Yvette Westbrook gave drugs to Turnbull, (3) a letter written from jail by Martin to Westbrook, and (4) Customs Agent Tom Radermacher's testimony, offered as background for explaining his actions during the investigation, that Turnbull was residing with Mitchell Smalls at the St. Croix Apartments in Virginia Beach. Turnbull also argues that the district court erred in allowing the Government, in its cross-examination of law enforcement officers who were called for the limited purpose of establishing a prior inconsistent statement of Government witnesses, to exceed the scope of direct examination. We have carefully considered these arguments and find them meritless. See Fed. R. Evid. 701 (inferences rationally based upon perception of witnesses and helpful to a clear understanding of these witnesses' testimonies and to the determination of a fact in issue are admissible); Fed. R. Evid. 801(d)(2)(E) (co-conspirator exception to hearsay rule); United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985) (holding that an out-of-court statement offered for the purpose of explaining why a government investigation was undertaken was not hearsay); Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.").

6

the testimony of, Government witnesses during rebuttal argument. Finally, with regard to sentencing, Clarke argues that the district court erred in enhancing his offense level by two levels pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with the drug conspiracy. Turnbull and Clarke assert error during the pretrial, trial, and sentencing proceedings. We address each argument in turn.

II. <u>PRETRIAL PROCEEDINGS</u>

A.

Turnbull argues that the district court erred in denying his pretrial motion for severance. Turnbull contends that being tried jointly with his co-defendants severely prejudiced him because the substantial evidence introduced by the Government that the co-defendants participated in the single conspiracy alleged in the indictment, in addition to the Government's evidence of lawful association between Turnbull and these co-defendants, led the jury to find Turnbull "guilty by association," even though the evidence showed that Turnbull was only involved in a separate, independent conspiracy. Turnbull asserts that this prejudice greatly outweighed the possible inconvenience and expense to the Government and witnesses of trying him separately.

The rule in this Circuit is that "[d]efendants who have been charged in the same conspiracy indictment should ordinarily be tried together." <u>United States v. Brooks</u>, 957 F.2d 1138, 1145 (4th Cir. 1992). Federal Rule of Criminal Procedure 14 provides an exception to this rule in allowing severance of trials where "prejudice" would result from a joint trial. <u>See</u> Fed. R. Crim. P. 14. "Such prejudice may be shown only where there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>United States v. Smith</u>, 44 F.3d 1259, 1266 (4th Cir. 1995) (internal quotation marks omitted). "The fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance." <u>Brooks</u>, 957 F.2d at 1145. We review a district court's denial of a motion for severance for abuse of discretion. <u>See id.</u>

7

Turnbull's argument is essentially that he was convicted on the basis of "spillover" evidence. We do not find this argument persuasive. While the Government's evidence against Turnbull may not have been as strong as the evidence against some of his co-defendants, the evidence was surely strong enough to implicate him in the conspiracy to import and distribute drugs and the conspiracy to launder money. See infra Part III.A. Turnbull presents no evidence that the jury was not properly instructed that it was not to consider the evidence against one defendant when deciding the guilt or innocence of another defendant, or that the jury improperly considered evidence implicating his co-defendants against him. In sum, "[t]his is not a case in which a defendant was convicted simply by innuendo because his associates were plainly guilty." Brooks, 957 F.2d at 1145 (internal quotation marks omitted). The district court, therefore, did not abuse its discretion in denying Turnbull's pretrial motion for severance.

B.

Clarke argues that the district court erred in denying his pretrial motion to substitute one privately retained counsel, Paulette Taliaferro, for another, Charles Malone. Clarke asserts that (1) he filed his motion almost one month before trial and the district court had sufficient time to address the motion without radically changing the trial schedule, (2) the district court's inquiry was inadequate, because it failed to inquire thoroughly into Clarke's dissatisfaction with Malone, and ignored completely the issue of whether granting the motion would delay the trial, and (3) Clarke and Malone both represented that a "breakdown in communication" had occurred. Clarke contends that the record indicates that this communication breakdown remained unchanged at trial and that Taliaferro's presence as additional counsel failed to remedy the situation because Taliaferro's role was minor.

Although the Sixth Amendment to the Constitution guarantees a criminal defendant the right to assistance of counsel, a defendant does not have an absolute right to the lawyer of his or her choice. See United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994). We review a district court's denial of a defendant's motion to substitute counsel for abuse of discretion. See id. In determining whether a district court has abused its discretion in denying such a motion, this Court consid-

8

ers three factors: (1) the "[t]imeliness of the motion," (2) the "adequacy of the court's inquiry into the defendant's complaint," and (3) "whether the attorney/client conflict was so great that it . . . resulted in total lack of communication preventing an adequate defense." Id. (internal quotation marks omitted).

In addition to arguing that the district court abused its discretion under the familiar Mullen standard, Clarke also urges us to follow the lead of the Ninth Circuit and adopt a different standard for reviewing a district court's denial of a motion to substitute retained counsel. The Ninth Circuit, however, applies the equivalent of the Mullen test where granting a motion to substitute retained counsel would require a continuance. See United States v. D'Amore, 56 F.3d 1202, 1204-07 (9th Cir. 1995), overruled on other grounds by United States v. Garrett, 179 F.3d 1143, 1145 (9th Cir. 1999). Although Clarke now contends that substitution here would not require a continuance, he never informed the district court of this before the court ruled on his substitution request. Indeed, by his words and omissions, Clarke gave the district court strong reason to believe that substitution of retained counsel would require a continuance. His pro se motion seeking substitution of counsel was actually titled "Motion for Continuance" and asked that the trial be continued for "not more than six weeks and not less than four weeks" so that he could "acquir[e] new counsel." (J.A. at 90.) Although the district court treated the motion as one to substitute counsel, the court clearly understood the relief requested to encompass a four to six week delay of trial in order for new counsel to prepare. Indeed, Clarke's counsel at the time, Malone, advised the court at the hearing on the motion, "I think he[Clarke] would have to give his argument with regard to why he wants me removed and why he wants a continuance." (J.A. at 95.) Although Clarke, in response to the district court's inquiry into his dissatisfaction with Malone, went into great detail as to the asserted deficiencies in Malone's representation, Clarke did not at any time inform the court that he was no longer requesting a four to six week continuance. The court subsequently twice asked Clarke whether he had anything else to say and Clarke twice responded in the negative. Even after the prosecutor argued that the substitution of counsel "could not meet the deadline of the trial" and "would obviously be a great imposition on the government because we've got at this time five other co-defendants that are going to be tried" and the court asked Clarke and

9

Malone whether they had anything further to say, Malone replied, "No, Your Honor." (J.A. at 99-100.) On this record, the district court certainly did not abuse its discretion in concluding that granting Clarke's motion to substitute retained counsel would require a continuance, and, therefore, even under Ninth Circuit precedent, the <u>Mullen</u> inquiry applies.**4**

With regard to the first <u>Mullen</u> factor,"the court is entitled to take into account the . . . public interest in proceeding on schedule." <u>Id.</u> (internal quotation marks omitted). Clarke filed his <u>pro se</u> motion on February 20, 1998, nearly one month before the trial was scheduled to begin. The motion was not heard until March 4, 1998, twelve days before trial, and the district court cited the proximity to trial as one of the reasons why the motion was denied. Because that delay cannot be attributed to Clarke, however, the timeliness factor should favor him. <u>See United States v. Johnson</u>, 114 F.3d 435, 443 (4th Cir. 1997) (finding that timeliness factor favored the defendant because he raised the issue of counsel's withdrawal in <u>pro se</u> motion filed over a month and a half before trial, and the motion was never forwarded to the district court judge, the prosecutor, or defense counsel); <u>Mullen</u>, 32 F.3d at 896 (finding that the timeliness factor favored the defendant because she had filed her motion to dismiss counsel twenty-seven days before trial, and the motion would have been heard in adequate time had the government not forgotten to file a response).

_____

**4** On appeal, Clarke maintains that in his motion for reconsideration, he "indicat[ed] substitution would <u>not</u> cause delay." (Appellants' Br. at 18.) In that motion, Clarke stated: "I presently have employed more experienced Counsel ready to assume my business before Your Honorable Court, if your Honor will grant me the freedom to terminate old counsel and activate new counsel, we can proceed." (J.A. at 91.) Taken alone, at least arguably, this statement does "indicate" an ability to "proceed" without a continuance. However, when considered in conjunction with Clarke's immediately preceding motion (for a four to six week continuance), which was filed less than a month earlier, this statement hardly constitutes a sufficient basis to alert the court that Clarke no longer sought a continuance. Moreover, we note that Clarke points to no place in the transcript where he or counsel directly told the court that he no longer requested a continuance.

10

With regard to the second factor, "[a]n inquiry into the reasons for a defendant's dissatisfaction with his or her lawyer is necessary for the trial court to determine whether good cause for substitution of counsel exists." Id. At the hearing on the motion, the district court asked Clarke for his reasons for wanting to remove Malone. Clarke essentially complained that he suspected Malone had been working with the Government, that Malone had failed to file certain motions requested by Clarke, and that Malone had only visited Clarke twice in jail. The district court pressed Clarke on his suspicion that Malone was working with the Government, and Clarke replied that he had no evidence supporting his suspicion and could not reveal more without incriminating himself. The court subsequently twice asked Clarke whether he had anything else to say and Clarke twice responded in the negative. As for the motions not filed by Malone, the district court heard from Malone that, in his professional opinion, the motions requested by Clarke were frivolous. We conclude that this inquiry into Clarke's complaint was adequate. See id. The court did not abuse its discretion in failing to inquire further into the breakdown in communication between Clarke and Malone, in light of the lack of evidence in the record that this issue was reasserted during the trial or that it impaired Malone's performance as counsel. **5** See United States v. Gallop, 838 F.2d 105, 108-09 (4th Cir. 1988).

The final factor we must consider is whether there was a total lack of communication preventing an adequate defense. At the hearing, Clarke stated that Malone "was not doing the right thing as far as getting involved in my case or going over my case with me," (J.A. at 97), and that Malone had visited him only twice in jail; Malone agreed that communications broke down when Clarke was transferred from Portsmouth to Williamsburg. From January until the time of the hearing in early March, Malone did not see Clarke in person, although he did talk with Clarke on the phone. From this course of events, Clarke attempts to analogize his case to the factual situation of Mullen. Mul-

_____

**5** On March 13, 1998, Clarke moved for reconsideration of his motion to substitute counsel. The district court denied this motion for reconsideration on the morning of trial, concluding that Clarke "ha[d] the best of all worlds" in being represented by both Malone and Taliaferro. (J.A. at 111.) There is no evidence in the record that Clarke made any further attempts to get rid of Malone.

11

len is readily distinguishable, however, because in that case, the defendant repeatedly refused to consult with her attorney during the trial, with the result being that the attorney was unable to provide any assistance. See 32 F.3d at 896-97. By contrast, the record in this case indicates that Malone, assisted by Taliaferro, aggressively defended Clarke. As such, we believe that this case is more analogous to cases in which we have found no total lack of communication. See Johnson, 114 F.3d at 443-44 (no total lack of communication where, despite communication problem between defendant and attorney, attorney acted on behalf of his client and filed relevant motions); United States v. Hanley, 974 F.2d 14, 17 (4th Cir. 1992) (no total lack of communication where attorney assisted defense by vigorously cross-examining government witnesses); Gallop, 838 F.2d at 109 (no total lack of communication where attorney assisted defendant during trial and cross-examined government witness).

In sum, although the timeliness factor favors Clarke, the record indicates that the district court conducted an adequate inquiry and that there was not a total breakdown in communication between Clarke and Malone that prevented an adequate defense. We note that the district court was caught in a difficult situation. If it denied Clarke's motion to substitute counsel, Clarke could bring a claim that he was denied his Sixth Amendment right to counsel of his choice, as he did here. If the court granted Clarke's motion to substitute counsel, and Taliaferro was unprepared to try the case, Clarke could bring a claim of ineffective assistance of counsel on collateral attack. Under these circumstances, the district court took the prudent approach, which was to keep Malone in the case, while allowing Taliaferro to work with Malone. Tellingly, Clarke makes no claim that Taliaferro was precluded or hampered in the extent of her participation in the defense. The district court, therefore, did not abuse its discretion in denying Clarke's pretrial motion to substitute counsel.

III. TRIAL PROCEEDINGS

A.

Turnbull first argues that the evidence was insufficient to sustain his conviction on Counts One, Two, and Three of the indictment, which charged a single conspiracy to import cocaine and cocaine

12

base, to distribute cocaine and cocaine base, and to launder money, respectively. Turnbull contends that there was a fatal variance between the single conspiracy charged in the indictment and the proof adduced at trial, which established multiple, separate, and independent conspiracies. Turnbull asserts that the evidence only showed his limited participation in one of those separate conspiracies and was insufficient to show that he knew about, joined, or knowingly participated in the single conspiracy, which involved illicit activities in St. Thomas, Georgia, North Carolina, Detroit, New York, and Virginia.

"A single conspiracy exists where there is one overall agreement or one general business venture." United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988) (internal quotation marks and citations omitted). "Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." Id. "In a conspiracy prosecution, a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." United States v. Kennedy, 32 F.3d 876, 883 (4th Cir. 1994). Because "a conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy," United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir. 1991), we will sustain the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it," Glasser v. United States, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

Applying the Leavis factors to this case, we are persuaded that the jury's finding that a single conspiracy existed was supported by substantial evidence. The Government's proof established a significant overlap of key actors: almost all of the activities of the co-conspirators, both indicted and unindicted, involved Eugene, Mitchell, or Clarke. Although the means of importing the cocaine from St. Thomas into the United States varied over time, ranging from unaccompanied baggage to Federal Express packages to body-smuggling by human couriers, the cycle of drugs smuggled into the United States

13

and drug proceeds wired back to St. Thomas via Western Union to purchase more drugs remained constant over the course of the conspiracy. Finally, the goal of the conspiracy remained the same over time: to import cocaine from St. Thomas into the continental United States, transform it into crack cocaine, and distribute it. Viewed in the light most favorable to the Government, this evidence supports the jury's finding of a single conspiracy to import cocaine and cocaine base, distribute cocaine and cocaine base, and launder money.[6]

Substantial evidence also supports the jury's conclusion that Turnbull participated in this single conspiracy. Two drug couriers, Yvette Westbrook and Quichelle Martin, testified that Turnbull helped obtain their airplane tickets to St. Thomas and transported them to the airport for their flight to St. Thomas to pick up drugs. Angel Ventura testified that Turnbull was one of Eugene's distributors, and McNair testified that on one occasion he had to wait for Turnbull to arrive at Eugene's residence before being able to purchase crack cocaine from Eugene. Finally, numerous individuals testified to sending money from St. Thomas via Western Union to Turnbull in Virginia, to receiving money in St. Thomas via Western Union from Turnbull in Virginia, and to being recruited by Turnbull to send money from Virginia via Western Union to various individuals in St. Thomas. Viewed in the light most favorable to the Government, this evidence is sufficient to sustain Turnbull's convictions on Counts One, Two, and Three, respectively. The fact that the Government did not introduce evidence that Turnbull participated in pre-indictment drug distribution in Detroit and Georgia, drug distribution in New York, or initial drug distribution in Virginia is irrelevant because Turnbull may properly be convicted of participation in the single conspiracy even without taking part in the full range of the conspiracy's activities or without being involved in the conspiracy over the whole period of its existence. See United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993).

_____

[6] The record indicates that the district court properly instructed the jury on single versus multiple conspiracies, and Turnbull raises no challenge to the jury instructions.

14

B.

Turnbull next argues that the district court erred in admitting several Western Union exhibits documenting money transfers involving Turnbull or Clarke where neither the actual sender nor actual recipient of the funds testified, on the ground that these exhibits were hearsay. The district court admitted these exhibits under Federal Rule of Evidence 803(6) upon finding that the documents at issue were business records that were trustworthy because the documents contained personal information to which only the sender and receiver, both members of the conspiracy, would have been privy.[7] Turnbull argues that anyone could use his name or telephone number on a Western Union to-send form and the mere fact that a recipient is required by Western Union to show identification is insufficient to establish that the person named in the record was the person who actually received the money.[8] We review the district court's decision to admit these Western Union exhibits for abuse of discretion. See United States v. Wells, 163 F.3d 889, 895 (4th Cir. 1998), cert. denied, 120 S. Ct. 109 (1999).

The Western Union money transfer documents at issue are clearly hearsay because they were offered by the Government to show that Turnbull laundered the proceeds of the conspiracy's drug sales by sending and receiving money via Western Union. See Fed. R. Evid. 801(c); United States v. McIntyre, 997 F.2d 687, 701 (10th Cir. 1993). These money transfer documents are therefore inadmissible unless they fall within an exception to the hearsay rule. The district court admitted the records under Federal Rule of Evidence 803(6), which allows admission of business records "unless the source of informa-

_____

[7] Each Western Union exhibit consisted of the to-send form, the to-receive form, the draft copy of the check issued to pay the transfer, and the computer record of the money transfer. A to-send form is a form filled out by the customer at a Western Union counter that lists the sender's name, address, and telephone number, the name of the intended recipient, and the amount of money being wired. A to-receive form is a form completed by the payee that lists the sender's name, the recipient's name, and other information needed to identify the transaction. See United States v. Arteaga, 117 F.3d 388, 391 (9th Cir. 1997).

[8] The exhibits challenged are 9H, 9J, 9Z, 9EE, 9FF, 9II, 10B, 10Z, 10BB, and 10DD.

15

tion or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). When the source of the information in the business record is an outsider, however, this information is excluded unless there is evidence that the business recipient had adequate verification of the information provided by the outsider. See, e.g., United States v. Reyes, 157 F.3d 949, 952-53 (2d Cir. 1998) (collecting cases); United States v. Mitchell, 49 F.3d 769, 778 (D.C. Cir. 1995); United States v. Cestnik, 36 F.3d 904, 908 (10th Cir. 1994). Adequate verification may be demonstrated by "(1) proof that the business has a policy of verifying patrons' identities by examining their credit cards, driver's licenses, or other forms of identification; or (2) proof that the business possesses a sufficient self-interest in the accuracy of the [record] to justify an inference of trustworthiness." Id. (internal quotation marks omitted and alteration in original).

In this case, a Western Union custodian of records, Jan Effinger, testified that a test question would be used if the sender wanted the recipient to receive the money without having to show identification. Implicit in Effinger's testimony is that identification is required absent a test question. Moreover, the Western Union forms stated that the recipient of the wire transfer must show identification in order to receive it. Because Western Union required the verification of identity to receive money, either in the form of an answer to a test question or identification, documents showing Turnbull as the recipient of wire transfers were admissible. See McIntyre, 997 F.2d at 702. The district court, therefore, did not abuse its discretion in admitting exhibits 9II and 10Z, which documented Western Union transactions in which Turnbull was the recipient and the sender did not testify.

By contrast, the record does not indicate that Western Union took similar measures to ensure the accuracy of the information provided by customers on the to-send forms. Effinger testified that Western Union agents do not verify the information completed by the sender unless the amount sent is $10,000 or greater.[9] Effinger also conceded that Western Union does not have any control over an individual providing a false name on a to-send form and does not keep any records to verify who actually requested the transfer. Because Western Union

_____

[9] All of the money transfers at issue involved amounts less than $10,000.

16

has no way to know from its records who actually requested the money to be sent, the accuracy of the records depends upon the person filling out the to-send form. As the district court noted, however, the conspirators used fake names and fake IDs. Under these circumstances, Turnbull's name on the Western Union to-send forms was not admissible for its truth under the business records exception to the hearsay rule. See United States v. Vigneau, 187 F.3d 70, 77 (1st Cir. 1999), cert. denied, 120 S. Ct. 1200 (2000); Cestnik, 36 F.3d at 908. Accordingly, the district court abused its discretion in admitting exhibits 9H, 9J, 9Z, 9EE, 9FF, 10B, 10BB, and 10DD, which documented Western Union transactions in which Turnbull (or Clarke using Turnbull's telephone number) was the sender and the recipient did not testify.[10]

Having concluded that the district court abused its discretion in admitting Western Union exhibits in which Turnbull was the alleged sender and the recipient did not testify, we turn now to whether this error mandates reversal of any of his convictions. A district court's erroneous evidentiary ruling is harmless error if we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) (internal quotation marks omitted). Turnbull concedes

_____

[10] We are not persuaded by the Government's arguments that these exhibits should be admitted because the recipient of the funds was required to show identification and because the transfers fit into a general pattern of sending money between Virginia and St. Thomas. Whether the transfers could be admitted against the recipient is irrelevant to the issue of whether they are admissible to show the identity of the alleged sender, Turnbull. Moreover, we believe that admitting these exhibits simply because they fit into a general pattern established by properly admitted Western Union exhibits is impermissible bootstrapping. Had the Government introduced independent evidence (such as eyewitness testimony and handwriting exemplars) to establish that Turnbull was the actual sender in these transactions, the to-send forms would arguably be the admission of a party-opponent, and, therefore, non-hearsay. See United States v. Vigneau; 187 F.3d 70, 74-75 (1st Cir. 1999), cert. denied, 120 S. Ct. 1200 (2000); United States v. Johnson, 28 F.3d 1487, 1498 (8th Cir. 1994). The record does not indicate, however, that the Government introduced such independent evidence.

17

in his brief that "the six Counts in the indictment alleging money laundering were sufficiently supported by the evidence," but argues that the inadmissible exhibits were prejudicial "as to the extent of his knowledge of the scope of the conspiracy charged and the extent of his participation therein." (Appellants' Br. at 47.) We interpret this argument as a challenge to the jury's conviction of Turnbull on Count Three, the conspiracy-to-launder-money charge, and find it unpersuasive. The evidence of properly admitted Western Union exhibits, taken cumulatively, is more than sufficient to support the jury's conclusion that Turnbull conspired to launder money. See Vigneau, 187 F.3d at 78. The district court's improper admission of exhibits documenting transactions in which Turnbull was the sender and the recipient did not testify was, therefore, harmless error.

C.

Clarke challenges his conviction on the ground that during rebuttal argument, the prosecutor impaired Clarke's substantial rights by improperly vouching for, and bolstering the testimony of, Government witnesses. During rebuttal argument, the Assistant United States Attorney made the following statements:

> In drug conspiracies the government ends up with a situation of having to utilize convicted felons, drug dealers, like that, in order to get people at this particular level, because, see, we can't find, you know, good citizens that witness these things. We don't find any preachers and priests and school teachers and Sunday school teachers that observe these things going on. I have been doing this for a number of years, and I have looked for those witnesses, but you don't find them. You end up with the people that have testified for the government, the Watleys, the McNairs, the Clint Williamses, the Fernandezes, the Venturas. That's what we have to deal with.

(J.A. at 524-25.)

> And furthermore, this agreement -- these are not agreements where we sit down and have everybody in the drug conspiracy sign a single document. I have been doing this

18

> for a number of years, and I have been looking for that agreement, but that never happens. It is a very informal thing. You know, you do this, you do that, drugs come up here, it is sold, money goes back down there. It is a very loosely run, informal type of conspiracy.

(J.A. at 526-27.)

> Look how the witnesses, how their testimony meshes together. The ones that have plea agreements with the government, their plea agreements are based upon truthful cooperation. If they don't testify truthfully, they have got another series of problems to deal with.

(J.A. at 528.)

Because Clarke failed at trial to object to the statements made by the prosecutor during rebuttal argument, we review Clarke's challenge to these statements on appeal for plain error. See Fed. R. Crim. P. 52(b), United States v. Olano, 507 U.S. 725, 731-32 (1993). Under Federal Rule of Criminal Procedure 52(b), a court of appeals cannot correct an error not noted below unless the error was "clear under current law" and was prejudicial in that it "affected the outcome of the district court proceedings." Id. at 734. Although the decision whether to correct a plain forfeited error that affects substantial rights is left to the sound discretion of the court of appeals, the court should exercise that discretion "if the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (alteration in original) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)).

It is improper for a prosecutor to vouch for, or bolster the testimony of, its own witnesses. See United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). "Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." Id. "Consequently, the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." Id. Impermissible

19

vouching and bolstering does not necessarily mandate retrial, however. Instead, "[t]he relevant question is whether the prosecutor[`s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>United States v. Sanchez</u>, 118 F.3d 192, 198 (4th Cir. 1997) (internal quotation marks omitted). In making this determination, this Court examines "(1) the degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention." <u>Id.</u>

Clarke first argues that the prosecutor's comment regarding how the Government could not find witnesses such as school teachers and religious leaders improperly vouched for the credibility of its witnesses because it assured the jury that the witnesses were the most truthful available. We disagree. Although it would have been preferable had the prosecutor not interjected, "I have been doing this for a number of years," we believe that his comment did not suggest any personal belief about the credibility of any witnesses, but merely acknowledged that the witnesses in this case, like the witnesses in all drug conspiracy cases, were not model citizens. <u>Cf. United States v. Adam</u>, 70 F.3d 776, 780 (4th Cir. 1995) (noting that prosecutor's use of the phrase "I think" in an innocuous, conversational sense "d[id] not suggest an attempt to replace the evidence with the prosecutor's personal judgments"). By stating "[t]hat's what we have to deal with" at the end of the comment, the prosecutor left it to the jury to make up its own mind about the credibility of the Government's witnesses. Moreover, Clarke points to no case in which a similar comment has been deemed improper vouching. <u>See Sanchez</u>, 118 F.3d at 198.

We are also not persuaded by Clarke's argument that the prosecutor's comment that there is not a formal written agreement in a drug conspiracy impermissibly bolstered the Government's case by telling the jury that the evidence in this case was sufficient to convict Clarke. As with the previous comment, it would have been preferable had the prosecutor not interjected, "I have been doing this for a number of years." Nevertheless, we do not believe that any jury could reasonably believe that the prosecutor was claiming that his experience from prior trials supported the evidence of conspiracy presented at this trial. <u>Cf. Adam</u>, 70 F.3d at 780. Rather, the prosecutor was instructing

20

the jury not to look for a formal written document, but to determine whether the evidence established an "informal" conspiracy. Again, Clarke points to no case in which a similar comment has been deemed improper bolstering. See Sanchez, 118 F.3d at 198.

Finally, we reject Clarke's contention that the prosecutor impermissibly vouched for the veracity of witnesses when he commented that the witnesses who testified pursuant to plea agreements would have to testify truthfully or face additional problems. This Court has held that a prosecutor may introduce the terms of a witness's plea bargain, including the promise of truthfulness, in its case-in-chief so long as the prosecutor does not imply that he has special knowledge of the witness's veracity and does not make improper use of the plea bargain promise of truthfulness in closing argument. See United States v. Henderson, 717 F.2d 135, 138 (4th Cir. 1983). In this case, the prosecutor did not imply in rebuttal argument that he had any special knowledge of the veracity of witnesses who had entered into plea agreements, but he merely recited the terms of the agreement. The prosecutor also did not "disproportionately emphasize[] or repeat[]" the promise of truthfulness in the agreements. Id. Accordingly, the prosecutor's comment did not constitute impermissible vouching or bolstering.

Even assuming, arguendo, that the prosecutor's comments constituted impermissible vouching or bolstering, we do not believe that these comments could have unfairly prejudiced Clarke, much less "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" as required by the plain-error standard. Olano, 507 U.S. at 736 (internal quotation marks omitted). The prosecutor's comments were not misleading, and the district court clearly instructed the jury that "[s]tatements and arguments of counsel are not evidence in the case." (J.A. at 1110.) The prosecutor's comments were three isolated comments during a long rebuttal argument following an unobjectionable closing argument. Although the Government's evidence against Clarke consisted entirely of witness testimony, the proof of Clarke's guilt was quite strong; indeed, Clarke does not attack the sufficiency of the evidence. Finally, the prosecutor's comments were not deliberately made to divert the jury's attention, but rather made to focus the jury's attention on the relevant evidence. See Sanchez, 118 F.3d at 198-99 (applying prejudice standard and reaching same conclusion).

21

## IV. SENTENCING PROCEEDINGS

Finally, Clarke argues that the district court erred in enhancing his offense level by two levels pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with the drug conspiracy. Clarke contends that this enhancement was based solely upon the hearsay testimony of Customs Agent Tom Radermacher at sentencing relating the trial testimony of Lisa Zeigler, who testified that she saw Clarke and other men counting money with guns beside them at Eugene's home, where Clarke allegedly lived. Clarke asserts that Radermacher's testimony was patently unreliable because Zeigler's trial testimony was impeached by her prior sworn statements at Eugene's trial, where she never mentioned seeing any men counting money with guns beside them in Eugene's home, and because Radermacher conceded that the incident could have happened when Clarke was still living in the Virgin Islands.

Section 2D1.1(b)(1) of the Sentencing Guidelines provides for a two-level increase in the offense level for a drug conviction if the defendant possessed a firearm. See U.S.S.G. § 2D1.1(b)(1). "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n.3). The district court's finding that Clarke possessed a firearm in connection with a drug offense is a factual determination that we review for clear error. See United States v. Rusher, 966 F.2d 868, 880 (4th Cir. 1992). In reviewing the district court's application of the Sentencing Guidelines, we give "due regard to the opportunity of the district court to judge the credibility of the witnesses." 18 U.S.C.A. § 3742(e) (West Supp. 1999).

Contrary to Clarke's contention, the district court did not rely solely upon Agent Radermacher's testimony relating Zeigler's sworn trial testimony in applying the enhancement, but it also relied upon its own trial notes and recall of Zeigler's testimony. Zeigler testified at trial that she witnessed Clarke, Eugene, Mitchell, and another co-conspirator at Eugene's residence counting large amounts of currency with guns beside them. Zeigler also testified that Clarke came to her house after Eugene was arrested to tell her not to testify against Eugene and that Clarke's statements made her scared. Although Zeigler could not recall when she witnessed Clarke and others count-

22

ing money with guns beside them and testified at Eugene's trial that she did not witness such an incident, the district court reasonably concluded that Zeigler was an extremely reluctant witness who did not want to testify because she was afraid of Clarke and that her testimony was credible. Because the district court could find Zeigler's testimony credible, see United States v. Hyppolite, 65 F.3d 1151, 1159 (4th Cir. 1995), and Zeigler's testimony established by a preponderance of the evidence that Clarke possessed a firearm in connection with a drug transaction, the district court did not clearly err in applying the two-level enhancement to Clarke's offense level pursuant to § 2D1.1(b)(1).

V. CONCLUSION

For the reasons discussed, we find no reversible error at the pretrial, trial, or sentencing phases of the criminal proceeding against Turnbull and Clarke. We, therefore, affirm Turnbull's and Clarke's convictions and sentences.

AFFIRMED