Filed 3/18/15  P. v. Zermeno CA2/4
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B253022 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. NA093021) |
| MARCOS GUSTAVO ZERMENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jesse I. Rodriguez, Judge.  Affirmed.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Marcos Gustavo Zermeno of second degree murder (Pen. Code § 187, subd. (a)),[1] and found true the allegation that he personally used a firearm (§ 12022.53, subd. (b)).[2]  In a bifurcated proceeding, the trial court found true allegations of three prior prison terms (§ 667.5, subd. (b)).

The court sentenced appellant to a term of 15 years to life, plus 10 years for the firearm allegation and three years for three prior prison terms, for a total of 28 years to life.  On appeal, appellant contends that the trial court erred in:  (1) denying his request for an instruction on involuntary manslaughter, and (2) giving an instruction on flight.  We disagree, and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The murder victim was appellant's girlfriend, Eleanora Hildago de Rivera (Rivera), with whom appellant had three children.  She died from a single gunshot wound to the right side of her chest under her arm, fired by appellant while they were sitting in his car outside the mobile home where they lived with appellant's mother, Maria Zermeno (Zermeno).  The wound was a contact wound, inflicted when the gun muzzle was pressed against Rivera's body.  In statements to the police, appellant described the shooting as an accident.  The prosecution sought to discredit that version of events, producing evidence that appellant's version was physically impossible.

---

[1]     All section references are to the Penal Code.

[2]     The jury found not true allegations that appellant  personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm, causing great bodily injury and death.  (§ 12022.53, subds. (c) & (d).)

Zermeno's mobile home outside of which the killing occurred was in a mobile home park in Long Beach. Rivera's sister, Yesenia Salcido (Salcido), lived in the same mobile home park, a short walk from Zermeno's home.

Around noon on August 4, 2012, appellant and Rivera's children were baptized. Appellant did not attend the baptism. Afterwards, Rivera, Salcido, and other family members went to Salcido's home for a party. Rivera left the party around 4:00 p.m.

Around 9:30 p.m. that night, Zermeno heard a car in her driveway and went outside. Appellant and Rivera were sitting in appellant's car with the engine running, Rivera in the driver's seat, appellant in the passenger's seat. Zermeno knocked on the car window and said they should turn off the engine because gas was expensive. Appellant and Rivera both responded that they would turn it off "right away." Zermeno told them it was time to come in, and she returned to the house. When they did not come inside, Zermeno went back outside about 10 minutes later and told them again to turn off the engine and come in. Appellant replied that they would come in soon. They did not appear to be fighting or upset, and they assured Zermeno that they were fine and were just talking.

Zermeno went back inside the house, and while changing a baby's diaper heard a loud bang. She and her husband went outside, and Zermeno went to the car, where she saw Rivera unconscious. Appellant was gone. Zermeno yelled in Rivera's ear to try to get her to respond. A neighbor heard the commotion and called 911.

Salcido was outside around 9:30 that night when she saw her mother run out of her residence, crying and shaking, and run to Zermeno's home. As Salcido followed, appellant approached. He was crying and looked nervous. Salcido asked him what happened. He continued crying and shook his head. Salcido

3

screamed at him, asking what he did to her sister. Appellant said it was an accident. Salcido had seen appellant with a gun a few weeks prior to the killing, but did not see him with a gun on that day.

Jose Perez was in his driveway in the mobile home park and saw appellant inside one of Perez's cars. When he approached appellant, appellant got out of the car and ran away. Perez tried to open the car door, but it was locked. Perez chased appellant and caught him at the security gate. Appellant denied that he had the car keys. Perez later found the keys in the car ignition. Appellant spoke with the security guards for a few minutes and then left. He did not come home that night.

Police officers found a fragment of a .38 caliber bullet on the floor of appellant's car near the driver's seat. It could have been fired from either of two types of .38 caliber pistols, both revolvers. No expended casing or any firearm was recovered.

Dr. Yulai Wong conducted an autopsy on Rivera. The bullet entered the right side of Rivera's chest, under her arm near her right armpit, and exited from her left back. Although Dr. Wong was unable to tell what position Rivera was in when she was shot, the location of the wound under Rivera's arm indicated that her arm must have been raised. Because the entry wound showed the circular imprint of the muzzle and black searing on the edges, the wound was a contact wound, inflicted when the muzzle was in contact with Rivera's skin or clothing. There was no other trauma to the body. Gunshot residue found on Rivera's right hand indicated that either she discharged the weapon or her hand was near the weapon when it was fired.

Appellant was arrested eight days later. A recording of his interview by the police was played for the jury. Appellant told the detectives that the shooting was an accident and that he never pulled the trigger. According to appellant, he and

4

Rivera were sitting in the car arguing about the "crazy shit she was doing." Appellant was sitting in the passenger seat of the car, holding the gun in his right hand across his stomach. Rivera pulled the gun, and "it just went off." The detective asked if the gun was an automatic because an automatic could fire accidentally but a revolver could not. Appellant replied that the gun was a revolver. The detective asked if appellant pulled the hammer back, but appellant explained, "it was already like that." Appellant said he did not know what he did with the gun. The detectives asked appellant why he ran, and he replied that he was scared. When asked why he had the gun in the first place, he said, "I don't even know. Probably [to] shoot myself."

Long Beach Police Department criminalist Troy Ward testified that appellant's version of the shooting was physically impossible. If the gun had discharged when Rivera pulled on it, the muzzle would not have been in direct contact with Rivera's body and the shot would not have left a contact wound. Further, if the gun had been in appellant's lap when it discharged, the angle of the bullet's trajectory would have been different than the angle of trajectory from under Rivera's arm and out the left side of her back. Ward also believed that if Rivera had grabbed the gun while appellant was holding it and the gun went off, there would have been more gunshot residue or burning on Rivera's hand. He acknowledged, however, that there would have been no residue if she let go before the firearm was discharged.

## DISCUSSION

I.    *Involuntary Manslaughter Instruction*

The trial court instructed the jury on first degree premeditated murder, second degree murder, and voluntary manslaughter (the latter on a theory of

5

sudden quarrel or heat of passion).  It also instructed on the defense of accident (CALJIC No. 4.45:  "[w]hen a person commits an act or makes an omission through misfortune or by accident under circumstances that show no criminal intent he does not thereby commit a crime").  (See *People v. Anderson* (2011) 51 Cal.4th 989, 996 ["a defendant is not guilty of a charged crime if he or she acted 'without the intent required for that crime, but acted instead accidentally'"].)

However, the court denied appellant's request for an instruction on involuntary manslaughter, because there was no substantial evidence to support such an instruction.[3]  Appellant contends that the trial court erred in refusing his request.  We disagree.

"Involuntary manslaughter is generally considered a lesser included offense of the crime of murder [citation], and a trial court's duty to instruct on it arises

---

[3]    The instruction appellant sought, CALJIC No. 8.45, provides as follows: "[Defendant is accused [in Count[s] _____] of having committed the crime of involuntary manslaughter in violation of section 192, subdivision (b) of the Penal Code.]  [¶]  Every person who unlawfully kills a human being, [without malice aforethought,] [and] [without an intent to kill, and without conscious disregard for human life,] is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b).  [¶]  There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend [oneself] [or] [another person] against imminent peril to life or great bodily injury.  [¶]  [A killing in conscious disregard for human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that [his] [her] conduct endangers the life of another and who acts with conscious disregard for human life.]  [¶]  A killing is unlawful within the meaning of this instruction if it occurred:  [¶]  1.  During the commission of an unlawful act [not amounting to a felony] which is dangerous to human life under the circumstances of its commission; or [¶]  2.  In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.  [¶]  [A violation of __ Code Section[s] __ is an 'unlawful act' [not amounting to a felony].]  [¶] [The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.]  [¶]  In order to prove this crime, each of the following elements must be proved:  [¶]  1.  A human being was killed; and  [¶]  2.  The killing was unlawful."

6

"'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation] . . .'" [Citation.] '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.] In applying this standard 'a court determines only its bare legal sufficiency, not its weight' [citation], and 'should not evaluate the credibility of witnesses . . .' [citation]." (*People v. Carlson* (2011) 200 Cal.App.4th 695, 703-704 (*Carlson*).)

Section 192, subdivision (b) defines two forms of involuntary manslaughter. It provides in relevant part that a killing is involuntary manslaughter when it occurs during "the commission of an unlawful act, not amounting to a felony," or during "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) As courts have explained, statutory involuntary manslaughter "requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is 'unlawful' if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done 'without due caution or circumspection.'" [Citation.]' [Citation.]" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1026 (*Guillen*).)

"In addition to these statutorily defined means of committing involuntary manslaughter, the California Supreme Court has defined a nonstatutory form of the offense, based on the predicate act of a noninherently dangerous felony committed

7

without due caution and circumspection. [Citation.] [¶] . . . [¶] . . . [C]riminal negligence is the governing mens rea standard for all three forms of committing the offense. [Citations.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006-1007 (*Butler*).)

"'"'[C]riminal negligence'" exists when the defendant engages in conduct that is '"aggravated, culpable, gross, or reckless"'; i.e., conduct that is '"such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences."'" (*Butler*, *supra*, 187 Cal.App.4th at p. 1008.) "'If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. [Citation.]' [Citations.]" (*Guillen*, *supra*, 227 Cal.App.4th at p. 1027.)

Appellant contends that three theories supported an instruction on involuntary manslaughter. First, he contends that the evidence supported a finding that the killing occurred during the misdemeanor offense of brandishing a firearm, a misdemeanor inherently dangerous to life. As defined in section 417, subdivision (a)(2), that crime is committed when a defendant, "except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or . . . in any manner, unlawfully uses a firearm in any fight or quarrel." (§ 417, subd. (a)(2).) "[A]n accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter. [Citations.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 814.)

8

In the instant case, there was no evidence that the killing occurred while defendant was brandishing a firearm. According to appellant's version of events in his statements to the police, he held the gun on his lap, Rivera grabbed it, and the gun went off accidentally. Under the prosecution's evidence, appellant's version of events was physically impossible, and the only reasonable inference was that appellant placed the muzzle of his revolver against Rivera's chest, under her arm, and fired. In short, there was no substantial evidence that the killing resulted from appellant's purported act of drawing or exhibiting his revolver in a rude, angry, or threatening manner.

Second, appellant contends that an involuntary manslaughter instruction could have been based on the noninherently dangerous felony of possession of a firearm by a felon. The short answer is that no evidence was presented to the jury that defendant was a convicted felon. At defendant's request, the trial court bifurcated the trial of his prior prison term allegations (§ 667.5, subd. (b)). Obviously, without evidence that defendant was a convicted felon, there was no evidence before the jury to show that appellant committed the felony of being a felon in possession of a firearm, and thus no basis for an involuntary manslaughter instruction premised on that offense.

Third, relying on Justice Kennard's concurring opinion in *People v. Bryant* (2013) 56 Cal.4th 959, 971-975 (*Bryant*), appellant contends that an involuntary manslaughter instruction was required under the theory that the killing occurred during an inherently dangerous assaultive felony. In her separate opinion in *Bryant*, Justice Kennard suggested that, based on the statutory history of section 192, the language providing involuntary manslaughter is a killing that occurs "in the commission of an unlawful act, not amounting to a felony," means "that a killing during an unlawful act is involuntary manslaughter *unless the unlawful act*

9

*is the type of felony that turns the killing into the greater crime of murder.*" (56 Cal.4th at p. 973, italics added.) Because assault with a deadly weapon is not such a felony, Justice Kennard concluded that "a killing during an assault with a deadly weapon [without malice] is involuntary manslaughter." (*Id*. at p. 974.)

The *Bryant* majority declined to consider the issue (*Bryant, supra*, 56 Cal.4th at pp. 970-971), and Justice Kennard's opinion does not reflect the current state of California law. Nonetheless, even if Justice Kennard's view were a correct statement of the law, it would not avail appellant. Just as there was no evidence that the killing occurred in the commission of a mere brandishing of a firearm, there is no evidence that the killing occurred during the commission of an assault with a firearm. On the evidence presented there was either no crime at all (because the killing was an accident), or the crime was a homicide greater than involuntary manslaughter (murder as the jury concluded, or voluntary manslaughter committed in a heat of passion, a theory the jury rejected).

Finally, as Justice Kennard stated: "[A] trial court has no duty to instruct on a legal principle that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principle of law. [Citation.] That is the case here. Therefore, the trial court here had no duty to instruct the jury, on the court's own initiative, on involuntary manslaughter." (*Bryant, supra*, 56 Cal.4th at p. 975.)

In the instant case, appellant did not request an instruction on involuntary manslaughter on the basis that the killing occurred during the commission of an assault with a deadly weapon. Therefore, under the rationale of Justice Kennard's separate opinion, the trial court had no duty to instruct on that theory.

Appellant contends that he was deprived of his due process right to have the jury instructed on his defense theory. (See *Bradley v. Duncan* (9th Cir. 2002) 315

10

F.3d 1091, 1098 [failure to instruct jury on defendant's theory of entrapment violated his due process right to present a full defense].) However, the defense theory of the case was that the shooting was an accident, and the jury was instructed as to this theory. Appellant was not entitled to have the jury instructed on involuntary manslaughter in the absence of evidence sufficient to support such an instruction.

II.     *Instruction on Flight*

Appellant contends that the trial court erred in instructing the jury regarding flight. The court instructed the jury pursuant to CALJIC No. 2.52 as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

According to appellant, the instruction impermissibly allowed the jury to infer that he had a culpable mental state and thus violated his constitutional rights to due process. As appellant concedes, the California Supreme Court has "repeatedly rejected identical challenges" to the flight instruction. (*People v. Taylor* (2010) 48 Cal.4th 574, 630; see *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158 [discussing the state high court's rejection of the argument that a flight instruction permitting a jury to infer awareness of guilt is unconstitutional].) The trial court accordingly did not err in giving an instruction on flight.

11

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.                COLLINS, J.


12